# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SOKOL HOLDINGS INC., BRIAN SAVAGE AND
THOMAS SINCLAIR,

                Plaintiffs,

      ⁄ against ⁄                              05 CV 3749 (KMW)

BMB MUNAI, INC., ALEXANDRE AGAIAN,
BAKHYTBEK BAISEITOV, GEORGES BENARROCH,
BORIS CHERDABAYEV, MIRGALI KUNAYEV,
CREDIFINANCE CAPITAL, INC. AND
CREDIFINANCE SECURITIES, LTD.,

                Defendants.

---

### Declaration of Scott Horton

SCOTT HORTON declares, under penalty of perjury:

1. I am a member of the Bar of this Court and a partner in the firm of Patterson Belknap Webb & Tyler LLP. I submit this Declaration at the request of Plaintiffs, who have requested that I render an opinion as to the suitability of the courts of the Republic of Kazakhstan for commercial litigation under *forum non conveniens* standards.

QUALIFICATIONS

2. I am not an attorney qualified to practice in the courts of Kazakhstan, but I am a legal comparativist with experience in commercial practice in Kazakhstan and a student of the Kazakhstani legal and judicial system. I studied law at the Universities of Munich and Mainz in Germany and then completed a J.D. degree at the University of Texas in Austin in 1981. I have been a practicing attorney in New York since 1982. I have a commercial practice which has

1

since 1989 focused heavily on the nations in transition, including the Kazakhstan. I have served as counsel to Kazakhstan's Ministry of Natural Resources and Environmental Protection and have represented numerous commercial interests on projects in Kazakhstan, with particular emphasis on the natural resources sector. I have studied the Kazakh courts and legal system since 1992, and have repeatedly monitored proceedings in Kazakh courts, with particular attention to commercial matters and criminal law proceedings raising human rights issues.

3. I co-authored a study of the first major court-supervised corporate restructuring in Kazakhstan, involving Karaganda Metallurgical Combinate ("Karmet") entitled "Bankruptcy, Kazakh Style;" this study subsequently featured as a part of a BBC documentary on the rise of Lakhsmi Mittal and his steel conglomerate. Since 1997, I have been a member of the faculty at Columbia Law School in New York, where I conduct courses in comparative and international law. One of my courses deals with the legal environment of nations in transition of the former Soviet Union, including Kazakhstan. I serve as a faculty advisor for two scholarly publications and supervise independent study projects. I am also an associate of Columbia's Harriman Institute with responsibility for legal studies. I have frequently taught and written about the legal environment and legal issues in the nations in transition, with a particular emphasis on the Kazakhstan and other the nations of Central Asia and their legal systems.

4. I travel regularly to Central Asia and spend a considerable part of my time there. In particular, I have studied the transformation of the legal profession in this region. I organized a program of interaction between the Association of the Bar of the City of New York and bar associations in Kazakhstan and Kyrgyzstan in 1993, and published a report on the status of the legal profession in Central Asia derived from this mission. I have maintained close ties with lawyers, judges, law scholars, and prosecutors in the region. I am a founding trustee of the American University of Central Asia, which was launched in 1995 with the support of the U.S. Government and the Open Society Institute, and is now one of the premier institutions of higher education in Central Asia. Within the board, I have oversight responsibility for the University's law department, which trains and prepares lawyers for practice throughout the Central Asian region, including Kazakhstan.

5. I have also participated in or supported a number of exchange programs which have brought Kazakh lawyers, prosecutors, and judges to Europe and the United States over the last five years, and I have met and spoken, often at length, with members of these delegations. At the request of the U.S. State and Justice Departments, I conduct a seminar entitled "An Introduction to Legal Systems of Central Asia" at the National Foreign Service Training Institute in Arlington, Virginia, each year. I have also been consulted on Kazakhstani legal issues by the United States Attorney for the Southern District of New York.

6. I am currently the chair of the Committee on International Law at the Association of the Bar of the City of New York; I previously chaired the Association's Committees on the Newly Independent States of the Former Soviet Union and on International Human Rights.

CLAIMS ASSERTED

7. I have examined the Second Amended Complaint (the "Complaint") filed by the Plaintiffs in this action, the papers filed in support of Defendants' Motion to Dismiss or Stay, and several related documents.

8. The Complaint articulates a number of causes of action: count I is predicated on tortious interference with contractual relations; count II seeks specific performance of a contract; count III sounds in breach of contract; count IV seeks recovery under the doctrine of unjust enrichment; count V is a claim for breach of fiduciary duty; count VI asserts claims for unfair competition; count VII is another breach of fiduciary duty claim; count VIII is for tortious interference with fiduciary duty; and count IX is for aiding and abetting a breach of fiduciary duty. The Complaint appears to assume the application of New York law, or at least the law of another common-law jurisdiction.

9. I am asked to consider as a preliminary matter whether the claims asserted in the Complaint could be brought in Kazakhstan and, if so, whether a Kazakhstani court would have ease in dealing with them. Since gaining its sovereignty in 1992, Kazakhstan has adopted a Constitution and a series of codes which are well within the mainstream of the continental European civil-law tradition. Its Civil Code (General Part), which would be the principal point of reference for the sorts of claims presented here, became effective early in 1995, is broadly similar to the Civil Code of the Russian Federation and bears close comparison with the codes of Germany, The Netherlands and other core civil-law jurisdictions.

10. Plaintiffs' claims sound largely in tort, and the focal claims of the Complaint are clearly tortious interference. There is no really close approximation of this doctrine in the law of Kazakhstan. To the contrary, a Kazakhstani jurist would approach the issues raised in the complaint in exactly the way that Mr. Zhanaidarov approaches them, essentially as questions of contract law. In his declaration, Mr. Zhanaidarov states that a "contracting party may sue for unjust enrichment," and that "Kazakhstan law also affords protection to confidential information under certain circumstances, and recognizes claims in tort and contract, as appropriate, against persons who misappropriate or misuse such information." Zhanaidarov Decl. ¶¶ 4, 5. But in fact, Kazakhstani law does not really have an area of law that comes close to the Anglo-American concept of "tort." At best this could be viewed as an aspect of the residual law of obligations. Similarly, the notion of fiduciary responsibility is at best a new arrival in Kazakhstani law. It is true that quite recently the Tsarist era term *popechitl'* was introduced for "trus-

3

tee," but the concept lacks a well defined system of accountability in tort law linked to violation of fiduciary responsibility.

11. I therefore believe that a Kazakhstani court, if faced with the claims asserted in the Complaint, would have great difficulties evaluating the claims conceptually and would attempt to recast them essentially as claims *ex contractu* rather than tort. This, I believe, would be highly advantageous to Defendants, since, assuming the accuracy of the allegations in the Complaint, the Plaintiffs' claims are far more viable as tort claims than as claims grounded in contract.

### INDEPENDENCE AND FAIRNESS OF THE KAZAKHSTANI COURTS

12. The Court should also consider, before dismissing a filing in favor of having a claim heard in a foreign court, whether such action would suit the best interests of justice. This raises the fundamental question of whether a Kazakhstani court, being seized of proper jurisdiction over the claims asserted in the Complaint, would likely resolve them in a fair and just manner.

13. In the fourteen years since it emerged on the international stage, Kazakhstan's lawmakers have done an on the whole admirable job in crafting legislation to support a market economy. In many respects their work can even be called state-of-the-art. Nevertheless, Kazakhstan's rule of law traditions are extremely weak, and even Kazakhstan's autocratic president, Nursultan Nazarbayev, has acknowledged that judicial independence is a weak point for his republic.

14. The United States Department of State accurately assesses the state of the Kazakhstani judiciary in its current Human Rights Country Report:

"The law does not adequately provide for an independent judiciary. The executive branch limited judicial independence. Procurators enjoyed a quasi-judicial role and were permitted to suspend court decisions."

If we review either the standards contained in the United Nations Basic Principles on the Independence of the Judiciary, Dec. 15, 1985, or the United States Constitution (which heavily influences the UN Basic Principles), the Kazakhstani judiciary comes up short on many fronts. Key to assuring independence is that the "term of office of judges, their independence, security, adequate remuneration, conditions of service… be adequately secured by law." In Kazakhstan, judges notoriously are selected in the discretion of the Executive, serve at his pleasure and are subject to removal at the Executive's whim. These facts assure a judiciary characterized by extraordinary deference towards the Executive. The compensation of judges, which in cases I have studied has fluctuated from the *tenge* equivalent of USD 300 - 500 per month, is far from adequate to secure meaningful independence.

4

15. Far from handling cases with the requisite independence, Kazakhstani judges have a strong reputation for handling cases either as proxies for the Executive or of accepting bribes to resolve cases in favor of economically and politically well situated local powerbrokers. Again, as the United States Department of State notes:

"Corruption was evident at every stage and level of the judicial process. Although judges were among the most highly paid government employees, lawyers and human rights monitors alleged that judges, procurators, and other officials solicited bribes in exchange for favorable rulings in the majority of criminal cases."

16. Similarly, Freedom House's authoritative assessment of Nations in Transit for 2006 concludes that democratic institutions in the nation are generally in a state of deterioration, and it highlights the diminishing independence of the judiciary: "The re-election of President Nursultan Nazarbaev in 2005, ensures that control over national and local governance as well as the judiciary will remain among the financial, business, political and even civil interest groups close to and/or loyal to the president, and will greatly limit the possibility for democratic development." Freedom House assesses Kazakhstan as "not free." In its 2005 Country Report on Kazakhstan, Freedom House stated: "The concentration of powers in the presidency, the capture of the Parliament by powerful, regime-connected financial interests, and the prevalence of personal patronage over formal rules have contributed to the continuing subordination of the judiciary to political interests. Kazakhstan's judicial system has lost much of its credibility by acting in full compliance with the regime's interests rather than stepping in to protect civil liberties. The local courts have been accused of many procedural and politically motivated charges. . ." Freedom House noted that the Kazakhstani judiciary had thus far failed to issue a single independent verdict protecting an individual against government abuse, in concluding that the Kazakhstani judiciary had shown year-on-year deterioration for five successive years, and was now among the least independent judiciaries of the Soviet Union's successor states.

17. The University of Maryland's IRIS Project concludes that "Kazakhstan['s] court system functions under strong central control. The courts are viewed by the public as having evolved relatively little in terms of independence and capability since the Soviet era."

18. These conclusions are consistent with my own observation of the Kazakhstani court system. Very important cases seem consistently either driven by offstage directions from the Executive or the result of a judicial version of pay-to-play. In one case I monitored, the judge concluded the trial and returned to the courtroom after a couple of hours to read a decision from a fax. The decision tracked exactly the case outcome that a senior Executive official had told me to expect when the case commenced. In another case, a criminal prosecution of Kazakhstan's best known exposé journalist, Sergei Duvanov, I observed extensive efforts to manipulate the legal proceedings by the Executive. Mr Duvanov had provoked the ire of the Kazakhstan Government by making a series of detailed reports, drawn heavily from publications in the

West such as *The New York Times* and *The Wall Street Journal*, about the case of *United States v. Giffen* (discussed in para. 20 below), involving corruption allegations against a senior aide to President Nazarbayev, but also implicating the president personally, together with two former prime ministers. After Duvanov was physically threatened, he appears to have been framed in a criminal proceeding. I subsequently obtained the confidential evaluation of two prominent Dutch law professors, sent as special monitors by the Chairman-in-Office of the Organization for Security and Cooperation in Europe, whose observations closely paralleled my own; I attach a copy of this report as Exhibit A. The Dutch professors also concluded that there was ample evidence to support a conclusion that the case had been manipulated, start to finish, by the Kazakhstani Executive. In another series of cases I studied, confiscatory tax assessments were brought against commercial interests whose owners had made statements critical of the Executive or who had endorsed a new political party, Ak Zhol, composed of business and political interests independent of the Executive. Even though the steps taken by the tax authorities were arbitrary and capricious, and the positions taken by the commercial interests were reasonable and based on the advice of major accounting firms, the courts refused to undertake an independent assessment of the circumstances and instead compounded the abuses – in one case demanding higher punishments than the tax authorities themselves had requested. In other cases I examined, stories raged of bribery and counter-bribery. Judges who behave with integrity and resolve cases in accordance with the law are not unheard of, but by most accounts are fairly rare.

19. In the present case, the principal officers of BMB Munai, profiled in the disclosures made by the company pursuant to American securities laws attached as Exhibit B hereto, are individuals of impressive stature in Kazakhstan, well connected with the state's political system and with its political elites. The Plaintiffs are foreigners who lack these connections. Moreover, one of the Plaintiffs is an American, and American investments in Kazakhstan have repeatedly been targeted by the Kazakhstani Executive in recent years.

20. The stigmatization of certain American investment interests in Kazakhstan has often been seen as a retaliation for *United States v. Giffen*, a criminal prosecution pending in the Southern District of New York relating to acts of corruption involving a citizen of the United States and three present or former senior officials of the Kazakhstani Government, not specifically identified in the complaint. The *Giffen* case was commenced in April 2003 and is set to come to trial in the immediate future. Based on materials filed in the case it is clear that the Kazakhstani officials involved in corrupt dealings with Mr. Giffen are President Nursultan Nazarbayev and two former prime ministers, Akezhan Kazhegeldin and Nurlan Balgimbayev. The pendency of this case is acutely embarrassing to the Kazakhstani Executive and has been a standing irritant in United States – Kazakhstani relations.

21. I have examined several different litigations in Kazakhstani courts in which claims were litigated between powerful local interests and foreign interests. Each such case led to a resolu-

6

tion in favor of local interests, even though its legal position appeared weak. This also leads me to think that the Plaintiffs' claims would likely not receive a fair hearing in a Kazakhstani court.

22. Mr. Zhanaidarov states that pursuant to the Kazakhstani Petroleum Law, a contractor's decision to assign all or part of its rights requires the written permission of the licensing authority. This is correct. However, in my experience this permission is granted freely based on a conclusion that the licensee has properly performed its program of works related to the license, and the proposed transferee is equally well positioned to perform its license obligations. This provision does not supply unlimited discretion to deny the assignment.

23. I declare under penalty of perjury under the laws of the United States of America that all the factual allegations above are true and correct, and that all statements of opinion reflect my best professional assessment formed after fair inquiry.

Dated:      New York, New York
            July 13, 2006

                                        _Scott Horton_
                                        Scott Horton

Exhibit A

RECYCLED

```
PC.DEL/513/03
30 May 2003
RESTRICTED
ENGLISH only
```



**Chairmanship 2003**
**Permanent Representation of the**
**Netherlands to the OSCE**

Vienna, 29 May 2003

Dear Colleagues,

Please find attached the experts report concerncing the case of Mr. Sergey Duvanov, and the comments of the Republic of Kazakhstan on this report. It is envisioned that a discussion will take place on these documents under 'current issues' in the Permanent Council of Thursday June 5th.

I would like to draw your attention to the accompanying letter of the Kazakh Permanent Representation requesting both documents to be treated confidentially. The documents are therefore only distributed to the OSCE participating States, ODIHR, and the Representative of the Freedom of the Media.

Sincerely,

Justus J. de Visser
Chairman of the Permanent Council

To:   All OSCE Delegations
       ODIHR
       RFOM



**THE PERMANENT DELEGATION
OF THE REPUBLIC OF KAZAKHSTAN
TO THE OSCE**
1190 Vienna, 23 Felix-Mottl Strasse
tel. 367-91-75, fax. 367-91-75-33

№ 31-15-02/330

The Permanent Delegation of the Republic of Kazakhstan to the Organization for Security and Co-operation in Europe presents its compliments to the OSCE Chairmanship-in-Office and has the honor to submit the comments of the Republic of Kazakhstan on the OSCE experts report concerning the Mr. Sergey Duvanov's case.

The Delegation draws attention of the Chairmanship-in-Office on that delicate issue and insists on the prevention of further public dissemination of intimate data and details of the OSCE experts report and comments of the Republic of Kazakhstan.

The Delegation call upon restricted distribution of these materials because of necessity of privacy protection of the under-age victim of sexual abuse.

The Permanent Delegation of the Republic of Kazakhstan to the OSCE avails itsef of this opportunity to renew to the OSCE Chairmanship-in-Office the assurances of its highest consideration.

Vienna, 28 May 2003.

Enclosure: 3 pp.

**CHAIRMANSHIP-IN-OFFICE
ORGANIZATION FOR SECURITY
AND CO-OPERATION IN EUROPE**

**VIENNA**



1

**Conclusion of the Republic of Kazakhstan on the report
of the OSCE experts F.Fedbrugge and W.B. Simsons of
April 8, 2003, on results of examination of the criminal case to charge
S.Duvanov in committing crime, specified by article 120 part 2 "b"
of the Criminal Code of Kazakhstan**

Conclusions made by the OSCE experts are as follows:

1. There were number of minor, and a few serious procedural violations.
2. The evidences presented are not sufficient to reach a conviction.
3. The conspiracy theory, advanced by the defence, has not been adequately refuted.
4. The investigation cannot be considered to have been full and objective.
5. According to the experts' opinion, there were few violations of procedural law by the court and incompleteness of trial hearing.

Kazakhstan cannot agree with these conclusions on the following basis:

1. Conclusions drawn in the report concerning procedural violations were merely based on the interviews with defence side. At the same time it is not exactly indicated, what violations took place.

According to the report, experts probably believe that procedural violations were made during the search on Duvanov's dacha. However, videotape about this investigation operation confirms that the search was conducted in accordance with provisions of Code of Criminal Procedure. Almaty Region Prosecutor's Office which examined appeal of Duvanov's defense did not find any violations.

Besides, the court has not acknowledged any investigating action conducted by the preliminary investigating body as illegal. In this regard statement about procedural violations is groundless and incorrect.

2. Drawing a conclusion on insufficiency of evidences, experts did not take into consideration the fact that the typical feature of this category of crimes is that these crimes are usually committed alone, without witnesses.

Consistent and clear testimonies of the victim, which she confirmed during the examination of testimonies on the place and the confrontations with S.Duvanov, and which are also impartially confirmed by the materials of criminal case, constitute evidences of guiltiness in this case. They are as follows:

a) conclusion of forensic-medical examination of the minor victim that determined presence of physical injuries specific for rape;

b) conclusion of forensic-biological examination that determined that sperm was revealed in K.Kapelushina's vagina as well as on her underclothes and dressing gown, and it is not excluded that the sperm belongs to S.Duvanov.

c) conclusion of molecular-genome examination that determined that revealed sperm belongs to S. Duvanov.

2

In connection with arguments of S.Duvanov that psychotropic substances were added to his food, the examination of food and beverages in S.Duvanov's home was conducted.

According to the results of examination, no narcotic, psychotropic substances in food and beverages as well as in S.Duvanov's blood were found, and according to the conclusion of forensic-medical experts intercourse in an unconscious condition is impossible.

Besides, a number of testimonies (T.Asmus, R.Baiseitov, N.Adilbekov and others) indirectly confirmed guiltiness of S.Duvanov.

3. During the investigation, intention of the victim to provoke S.Duvanov to perform intercourse with her was not determined. Moreover, from the materials of case it becomes clear that namely S.Duvanov initiated closer relations by asking earlier unfamiliar victim to cook dinner, then inviting to sauna, offering to listen to music in his home and to drink alcohol. These facts were confirmed by witnesses A.Cherkassov who had friendly relations with S.Duvanov and by Cherkasov's daughter T.Asmus.

Except uncorroborated statements of S.Duvanov and his defence regarding provocative character of the criminal case, they did not present a single objective proof. This was also confirmed by experts themselves in their report – "Of course, the claim is often made irresponsibly, without any corroboration; in such cases it will normally be sufficient for the prosecution to invite the defence to offer some support for its claim. If the defence fails to do so, the conspiracy version loses all credibility and may further be disregarded without harm to the prosecution's case".

Therefore we believe that statements of Duvanov's defence regarding provocative character of this case are unsupported by evidence and made with the purpose to take him out from the criminal charge.

4. In our view, report of experts contains ungrounded conclusions about incompleteness and partiality of the investigation.

42 witnesses were questioned on the case, and evidences of victim K.Kapilushina, witnesses A.Cherkasov, S.Cherkasova, T.Asmus, I.Sai, R.Baiseitov, N.Adilbekov and others, directly and indirectly confirmed S.Duvanov's guiltiness.

17 examinations were made on the case, out of which molecula-genom, biological and forensic-medical examinations confirm S.Duvanov's guiltiness, and there is no a single conclusion of examinations which implies doubts of his guiltiness.

Actions which were made during investigation of a simple, one episode, criminal case, seem more than enough.

3

In course of preliminary investigation and inquiry 24 applications of the case participants were allowed, that is showing objectivity of examining the facts of the case.

We consider, that preliminary investigation on the case has been conducted fully and objectively, the investigating body did not commit procedural violations, of which was recognized by court.

5. In particular, it was indicated in the report that trial protocol was filled improperly by the court, where records of sessions dated on 8th and 16th of January 2003 are missing, as well as questions of the case participants to the witnesses and victim.

The conclusions of the OSCE experts contradict reality, because in the trial protocol all mentioned records as well as questions and answers were shown.

Moreover, court ruling to refuse request to conduct the investigation on determination of the fact that the date on the statement of I.Sai was written by another hand is well-founded, because the day of submitting statement is fully confirmed by evidences of the victim, her mother and officers of the Karasai Police Station during preliminary investigation and at the trial.

In the report a notion of regret was made concerning the ruling of the appellate court not to allow OSCE experts to attend its hearing.

This decision was made according to the statement of the victim, in fool conformity with norms of criminal-procedural law and this decision is an unalienable right of the court.

In conclusion it should be mentioned that the report of the OSCE experts tends to be evidently tendentious with regard to the person of the victim and directly ignores her lawful interests, as a minor, her personal features are deliberately and negatively assessed, correctness of evidences of K.Kapelushina is questioned without enough reasons for that.

Based on the results of the trial, conducted in conformity with all norms of the Criminal-Procedural Code of the Republic of Kazakhstan, conviction was passed. All statements of parties, including ones of S.Duvanov and his defenders, were subject to court examination with the presence of large number of foreign observers and were appropriately evaluated by the court.

Criminal prosecution with regard to S.Duvanov is of exclusively criminal and legal nature and by no means related to his political and professional activities.

It is necessary to mention that according to legislation of any country of the world court decision is final and subject to review and evaluation only in appropriate courts of appellate and supervision instances.

# THE DUVANOV CASE

### Executive Summary

There were a number of minor, and a few serious procedural violations.
The evidence presented is not sufficient to reach a conviction.
The conspiracy theory, advanced by the defence, has not been adequately refuted.
The investigation cannot be considered to have been full and objective.

### *Abbreviations Used*

| | |
|---|---|
| Commentary | Commentary to the Code of Criminal Procedure of the Republic Kazakhstan (I.I. Rogov a.o. (eds.), *Ugolovno-Protsessual'nii Kodeks Respubliki Kazakhstan, Kommentarii*, Parts.1 & 2, Almaty 2002. Former minister of justice I.I. Rogov is at present head of the legal department of the President of Kazakhstan; the Commentary may therefore be regarded as eminently authoritative.) |
| CCP | Code of Criminal Procedure of the Republic Kazakhstan |
| Kapeliushina | the alleged victim, Kristina Nikolayevna Kapeliushina |
| We (us, our) | the authors of this report |

## PRELIMINARY CONSIDERATIONS

### Background

On 28 October 2002, Sergei Duvanov, a journalist active in the human rights movement in Kazakhstan, was arrested in the village of Kainar, not far from Almaty. A criminal investigation was instituted against him on suspicion of having raped Kristina Kapeliushina, a girl under age, the previous day.

Persons active in the human rights movement in Kazakhstan protested against the prosecution of Duvanov right from the beginning, asserting that he was the victim of a plot and that the case had been prefabricated.

By judgment of the Disctrict Court of Karasai (province of Almaty) of 28 January 2003, Duvanov was found guilty of raping Kapeliushina, receiving a sentence of three years and six months in a labour colony of the general regime. The court held that Duvanov had not been aware that Kapeliushina was under age and sentenced him therefore under the provision covering rape (part 1 of art.120 of the Criminal Code of Kazakhstan), and not under part 2 of the same article, which deals with the more serious crime of raping a person under age.

Duvanov and his lawyers launched appeals against this sentence, so did the procurator, Kapeliushina, her mother (as her legal representative), and the lawyers representing Kapeliushina and her mother. The appeals were heard by the provincial court in Taldy-Kurgan on 11 March 2003. We were asked by the Chairman-in-Office of the OSCE to investigate the matter, according to the following Terms of Reference.

## Terms of Reference

Our Terms of Reference included the examination of the criminal proceedings against Sergei Duvanov, from the moment of arrest, particularly with a view towards the observance by all concerned of the relevant legislation on criminal procedure. The examination should include a study of the court record of the trial and interviews with the personnel involved – police officers, prosecutors, and judges, and also with important witnesses who did not appear in court.

Among other documents to be taken into consideration were the reports prepared by independent observers present at the trial and relevant press publications which might shed light on the political atmosphere surrounding the trial.

We have decided to refrain from interviewing the trial judge and the three judges of the appellate court, for reasons of principle (the judge expresses himself fully and completely in his judgment and should not, and should not be invited to, comment on the case and his judgment).

We did not interview key-witnesses who did not appear at the trial, for practical reasons (lack of time; the gist of their statements made during the pre-trial phase could be established on the basis of other documents).

We have instead interviewed the defence lawyers at length and several times.

## Collection of Materials

The Terms of Reference imply that we are to be regarded as private actors, whose involvement in the matter is based on our academic and professional qualifications. We do not represent any organization or agency, neither international, nor national, nor private. This implies that we do not possess any procedural status in the Duvanov case, where we are to be considered as complete outsiders. We do not possess therefore any of the powers or rights enjoyed by the various participants in the case (in the sense of the immediate participants, as meant by art.7 point 9 CCP, and the "other persons participating in the case", as meant by point 25 of the same provision) or by the judicial and law enforcement agencies of Kazakhstan. This means that we have been completely dependent on the voluntary co-operation of persons and agencies involved in the case and on information available from open sources, such as the legislation of the Republic Kazakhstan and publications in the press. Any conclusions drawn by us must be viewed in this light.

After our arrival in Kazakhstan we have had conversations with the officers in charge of the preliminary investigation (*sledovateli*), with the prosecutors (procurators) in the Duvanov case in the trial court and in the appellate court, with Duvanov's defence lawyers, and with counsel of Kapeliushina.

We have also been granted access to the full materials of the case, at least in such a manner that we were invited to ask specific questions and indicate the materials we would like to inspect in order to find answers to such questions. This phase of our investigation took place in Taldy-Kurgan, where the materials were located at the time. By that time professor Simons had already left Kazakhstan.

## Admission to Appellate Court

We arrived in Kazakhstan on 10 March 2003, just in time to be present at the appellate hearing in Taldy-Kurgan.

The CCP contains the usual rules concerning the openness of court proceedings, as provided in all civilized countries, *i.e.* criminal trials are open to the public, except in a few special instances,

indicated by law: protection of state secrets, cases involving minors, sexual crimes, a.o. (art.29). The judgment must be announced in open court in any case (art.29).

Although the law knows only closed or open sessions, it is considered possible to allow persons, other than the participants, to be present at closed sessions. This is borne out by the Commentary to art.29, which states that "It has to be assumed that the court, taking account of the aims of conducting a closed trial session, is entitled, at its own discretion, to admit representatives of public organizations ... to be present at the session of the court, explaining to them the non-permissibility of divulging the circumstances examined during the closed part of the trial." (I, 78). The trial court of the Karasai District did indeed allow observers from domestic organizations and foreign observers to its otherwise closed sessions. This was done over the objections of Kapeliushina and her mother and their lawyers.

The appellate court in Taldy-Kurgan apparently took notice of the request to allow us to attend the appellate hearing, which had been sent to them through the Kazakhstan Ministry of Foreign Affairs. It was announced, however, about an hour and a half after the scheduled session of the court had started at 10.00 hours on 11 March, to the crowd waiting in the court lobby, that the hearing would be closed and that no outsiders would be allowed in. Late in the afternoon the judgment was announced in open court. This was therefore the only part of the appellate hearing we were able to attend.

On the same day the General Procuracy of Kazakhstan issued a press statement which, among other things, gave more details about the reasons for not allowing us to attend the appellate hearing:

"Before the beginning of the session of the appellate court a request from representatives of international organizations was received concerning their admission to the procedure. The court refused this request, on account of the objections raised against it by the mother of the victim. According to her opinion, the participation of outsiders at the original trial had led to the publication of details of the crime, concerning the personal life of the under-age victim, in the mass media, including foreign ones."

Perhaps the most extensive publication of such personal details, within a context fiercely hostile to Duvanov, and even before the first trial had started, had occurred in a Kazakhstan weekly tabloid *Dozhivem do Ponedel'nika*, whose editor-in-chief is Erik Nurshin. The same person appeared in the Duvanov trial as counsel of Kapeliushina. If there were therefore any violations of the confidentiality of the first trial by other media afterwards, the damage to the right of privacy of Kapeliushina had already been done. And, moreover, done by the side who was complaining about it afterwards. We hold therefore that the mother's objections should have been disregarded as utterly disingenuous in this case.

This still does not answer the question of the correctness of the decision of the appellate court. On the basis of a restrictive reading of art.29 CCP one could indeed accept that trials are either to be open or closed, and that, once the conditions stipulated by art.29 have been met, the trial ought to be closed.

On the other hand, the Commentary, as quoted, opens the doors to some extent in special cases; one of these is the admission of "representatives of public organizations", a formula which would certainly imply the representatives of foreign diplomatic missions or of international organizations. The trial court had indeed recognized this possibility and acted on it, thereby creating a precedent for the appellate court to follow.

We regret therefore that the appellate court has not opted for a more rational and sensible construction of the pertinent provisions of the CCP. We have reason to assume that the Government of Kazakhstan shares this regret.

## Methodology

A criminal trial starts in principle with a hypothetical narrative, built up during the investigation phase, and put forward by the prosecution. The essential elements of this narrative, as defined by the law, must be proved in the course of the trial, according to a procedure, also defined by law, and through means of evidence, also defined by law. If the narrative is told and proved in the prescribed manner, it will be accepted by the court and result in the conviction of the defendant. This is also the way criminal trials are viewed by Kazakh criminal lawyers, who refer to the narrative as the "version" (*versiia*) or use the Latin technical term of *fabula*.

The defending side (the defendant and his counsel) could in principle remain passive and limit itself to contesting the legality of the steps taken by the prosecution. Often, however, it may improve the defendant's position to be more active and present alternative versions for parts of the prosecution's story, and even a completely alternative narrative. The effectiveness of this approach is based on the requirement that the court must evaluate evidence according to its internal conviction, guided by the law and its conscience. This is the formula of art.25 CCP, which is in line with the position taken by the law of criminal procedure in most countries of the civil law tradition. It is a close parallel (although not quite identical) to the proof "beyond reasonable doubt" of Anglo-American law. It implies in any case that the presentation of an alternative story (either in full or in part) obliges the court, and other judicial and investigative agencies as well, to weigh the credibility of such a story against the credibility of the prosecution's narrative.

In the case of rape, the most obvious alternative stories would be: the alibi approach – it was not the defendant but another person who committed the rape, or the consensual sex defence – the victim was not raped but had consensual sex with the defendant.

The most destructive – from the prosecution's point of view – and in theory most effective defence is the proposition that the prosecution case is the result of a conspiracy, a set-up. Where such a claim cannot be disproved, or, even stronger, where it retains a certain credibility, every single action by investigative, prosecutorial and judicial agencies becomes affected and in some way suspect.

Of course, the claim is often made irresponsibly, without any corroboration; in such cases it will normally be sufficient for the prosecution to invite the defence to offer some support for its claim. If the defence fails to do so, the conspiracy version loses all credibility and may further be disregarded without harm to the prosecution's case. If, on the other hand, the defence presents indications which would *prima facie* support its claim, then the prosecution's only option – if it wants to uphold the credibility of its own case – is to answer the defence's allegation point by point. Obviously, the more indications to support its story the defence is able to offer, the more effort is required by the prosecution to counter these.

All this is not yet directly in the realm of evidence, inasmuch as the presumption of innocence (considered one of the basic principles of criminal procedure according to art.19 CCP) does not require the defendant to prove his innocence and also implies that irremovable doubts about the defendant's guilt are to be interpreted in his favour (point 3 of the same provision).

The practical difficulty – from the defence's point of view – of the conspiracy version is that it entails that persons or agencies on the side of the prosecution (police, investigators, procurators, or even court officials) were probably involved and would therefore almost certainly have been guilty of criminal offences themselves. If this indeed would be the case, then such persons or agencies can be expected to do everything in their power to thwart the defence's efforts in this respect. In many countries, legislation or administrative regulation therefore provides that in cases where there is even a moderately significant indication of wrongdoing on the side of the prosecution, investigation of such allegations is transferred to special independent agencies.

In the Duvanov case there are two competing versions: the prosecution case which is briefly that Duvanov raped Kapeliushina, a girl under age, and the defence case which asserts that Duvanov was set up by people in authority and that all evidence and all investigative, prosecutorial and judicial activities concerning Duvanov should be viewed in this light. The first case is subject to the entire legal process of prosecution and presentation of evidence, with all the formal and substantive requirements of the law; the second version has to be examined, as it has been presented by the defence and answered by the investigative, prosecutorial and judicial agencies. Finally, the two versions have to be weighed against each other, in order to reach a conclusion as to whether the trial court and the appellate court could have reached the decisions they took, taking into consideration that such decisions should rest on a weighing of the evidence "in accordance with the law and [the judge's] conscience" (art.25 CCP).

We shall investigate therefore first the prosecution case, as it developed from the very beginning, especially with an eye toward the proper observance of the formal and substantive requirements to all investigative, prosecutorial and judicial actions as stipulated in the CCP.

Then we shall consider the defence case. Unlike the prosecution, presenting from the beginning a consistent story (the rape of Kapeliushina) which receives more detail and corroboration in the course of the proceedings, the defence sets out with only the general assumption of a plot; in the course of the proceedings the details and chronology of this plot, as asserted by the defence, are gradually filled in. The treatment of the defence version will therefore be in the form of a reconstruction *a posteriori* of the story of what actually happened according to the defence. This story, which is itself not subject to the strict rules of criminal evidence, should nevertheless be checked for its internal consistency and credibility.

At some stage, as we shall see, the question arises whether a third version, not mentioned by prosecution or defence, is not worth considering. In this case it is the possibility of consensual sexual relations between the defendant and the alleged rape victim. We believe that we are not at liberty to disregard this question.

In the end, the two principal stories, as they stand at the end of the proceedings, have to be weighed against each other. The two crucial questions in this respect are:

Is the prosecution case by itself of sufficient quality to lead to a conviction?

Is the defence version of sufficient quality to lead to such doubts as would prevent a conviction?

The judgments of facts in these matters can only be regarded as provisional, because we lack, as indicated above, the status of judges or arbitrators and the concurrent powers to collect all the evidence required. Our investigations could not, as a rule, go to the bottom, lead to the establishment of the truth, and we had to be satisfied with answers which indicated that at the state of our knowledge a certain view was more or less likely to be the correct one.

Our evaluations of the legal aspects of the case are of the ordinary type: they are based on our knowledge and understanding of the relevant rules of Kazakh law and of appropriate internationally accepted legal standards.

### Acknowledgments

We gratefully acknowledge the co-operation of the Government of Kazakhstan and of Minister of Foreign Affairs Tokayev personally, which allowed us to come to Kazakhstan, do our work without hindrance, and acquire access to the full case file.

Ambassador van Leeuwen and Counsellor Slagter, and the entire staff of the Embassy of the Kingdom of the Netherlands, were tireless in their efforts to offer all necessary substantive and logistic support.

Ambassador Venczel, Head of OSCE Centre in Almaty, and his staff are also to be thanked most cordially for their help and support.

We appreciate the time made available and the information provided to us by the following persons:

From the Almaty Province Procuracy: D.I. Baitukbayev, G.T. Mirazov, R.G. Tyulyybekova
Investigating officers: G.T. Zhakupova, E.K. Abdrakhmetov
Experts: N.P. Danilova, T. Kulbayev, T.I. Aukubayeva
Defence counsel: V.I. Voronov, E. Zhovtis, S.K. Sarsenov
Counsel of Kapeliushina: E.K. Nurshin

## THE PROSECUTION CASE

Our observations concerning procedural violations etc. are printed in italics.

### General principles

The CCP, in its second chapter (arts.8-31), proclaims a number of general principles, of which the following have been of the major relevance in the Duvanov case.
Art.11: Justice is administered only by the courts. One of the consequences of this principle is that a person can only be deemed guilty of a crime by a proper judgment of the court.
Art.14: Inviolability of the person. One of the consequences of this principle is that no one may be in any way deprived of his freedom, except in the manner and on the grounds defined by the CCP. Also, the court must immediately release a person who has been in any way deprived of his freedom in a manner which is not entirely in conformance with the law.
Art.19: Presumption of innocence, which also implies that irreducible doubts about the guilt of the defendant, and doubts which arise in the application of criminal and criminal-procedural legislation must be interpreted in his favour.
Art.24: The all-round, full and objective examination of the circumstances of the case. This duty does not only concern the judge, but also the procurator, the investigator, and the police.
Art.25: Judges, procurators, investigators and police officers must evaluate evidence on the basis of their inner conviction; this conviction must be based on an examination of the evidence in its totality; the examination must be guided by the law and by conscience.
Art.26: The right to defence. This concerns the rights of the defendant in defending himself, as well as his rights to be assisted by counsel. The right also implies that public officials conducting the case (police, investigators, procurators, judges) must explain his rights to the defendant and take the necessary measures to secure the exercise of these rights.
The practical significance of the principles enunciated in chapter 2 of the CCP is explained in art.9: violations of these principles, dependent on the nature and seriousness of the former, entail the nullity of the entire procedure in the case at hand, or the setting aside of decisions taken in the case, or preventing materials acquired in the case from being used as evidence.

### Persons involved

The central figure during the pre-trial investigation in Kazakh criminal procedure is the investigator (*sledovatel'*). In the case of ordinary crimes, such as homicide, theft, and sexual offences, an

investigator who is part of the police organization appears. He is nevertheless placed outside the police command structure. He is supervised by the procurator and some of his more important activities need procuratorial approval.

In addition to the usual participants in criminal trials, as they are known in other jurisdictions (defendant, defence counsel, prosecutor, court, victim, witnesses, experts), Kazakh criminal procedure also allows the participation of public defenders and of counsel for other parties. In the Duvanov case the following persons appeared during the first instance trial:

For the prosecution: state prosecutors (procurators) G. Mirazov and V. Sharapa
For the defence: advocates V. Voronov and S.K. Sarsenov (and M. Zagitov on the last day), "defenders" E.A. Zhovtis and M.M. Pul'man
For the victim: advocate E. Nurshin (and her mother I. Sai as her legal representative)
For I. Sai, mother and legal representative of the victim: advocate V. Martynovskii.

### Kapeliushina's story

Before discussing the various stages of development of the prosecution's case, it will be useful to summarize the events of 27 October 2002 and the preceding events leading up to it, as presented by the alleged victim in her video-recorded interview during the preliminary investigation and, with some variations, during the trial. This narrative was accepted by the prosecution and formed the basis of the indictment and it was taken over by the court in its judgment, with one major exception.

Kristina Kapeliushina was born in Karaganda on 19 January 1988, the daughter of Nikolai Iv. Kapeliushin and Irina Nik. Sai. Her father died in 2000. Her mother gave birth to a daughter on 31 May 2002. As the baby was not doing well in the harsh climate of Karaganda, the mother decided to move to Almaty. The mother and Kristina (without the baby) went to Almaty by bus some time in August, in order to find an apartment. They had no relatives or acquaintances in Almaty. There were people at the bus station, offering apartments for hire. The mother met Cherkasov and he offered her hospitality in his house in the village of Kainar until she would have found a place to live. In September the mother went back to Karaganda for a few days to collect the baby and to finalize the sale of their apartment there. The mother and Cherkasov's wife did not get on and they had to find another place to live. Somewhat later in September they moved to a neighbouring village, Chemolgan, where they stayed with an old man Anatolii Pavl. Dyorin, for two or three weeks. From there they moved to Almaty, where they had found an apartment. In the meantime Kapeliushina had visited the Cherkasov family a few times during weekends, as she had befriended Cherkasov's stepdaughter (Cherkasova's daughter) Tatyana Asmus (commonly called Amina), a 14 year-old girl. On Friday 25 October 2002 she again went to Kainar to stay with the Cherkasov family. Duvanov, a journalist living in Almaty, would occasionally come to his dacha in the village of Kainar, next door to the house of Cherkasov, in order to work on repairs and remodelling. Cherkasov, who had some skill as a welder, would assist Duvanov from time to time with various jobs around the house. It was during this weekend that Duvanov and Kapeliushina met for the first time. On Sunday 27 October Kapeliushina had prepared some lunch and afterwards stayed on to help Duvanov and Cherkasov with painting jobs. Duvanov inquired about her name, age and interests, suggesting that he could help her with her plans for the future. Kapeliushina scribbled her age and chief interests on a piece of paper, which she handed to Duvanov. At the end of the working-day, Duvanov, who had a sauna in his courtyard, invited the Cherkasov family to make use of it. They all took turns and then went home, but Kapeliushina and Tanya Asmus stayed behind, Duvanov having asked them to help him put away books and then inviting them to listen to music and have something to drink. After a while Tanya also went home and Duvanov went back to the sauna. When he came out again he asked

Kapeliushina to give him a massage. She did as he had asked, but as she tried to leave the room then, he locked the door, grabbed her and pushed her on to the couch, where he raped her, after having pulled down her knickers. He then let her go. She went back to the Cherkasov home, but did not tell anyone. When her mother called, she said that she would come home. She went out on the street, where she stopped a car driven by two local men. They took her to Almaty to her mother's apartment. She told her mother what had happened, and they took a cab which took them to the Karasai police station. (A policeman on the street had told them that they should report the event at the local police station.) There, early in the morning on 28 October, her mother filed a statement which then set the machinery of criminal investigation into motion.

## Preliminary Investigation

### Arrest

On 28 October 2002 at about 6.00 hrs Irina N. Sai and her daughter Kristina N. Kapeliushina appeared in the police station of the village Karasai (Almaty province), where I. Sai, on behalf of her under-age daughter K. Kapeliushina wrote a statement to the effect that a man named Sergei had raped her daughter in the night before. Such a statement to the police constitutes one of the grounds for instituting criminal proceedings (arts.177-178 CCP). The statement should be signed and dated and the persons making it should be cautioned about liability for making false statements.

*During the trial the defence brought up that the date on the Sai statement had been written in another hand, and requested an expert investigation on the matter. This request was refused by the court.*

The statement is then registered and the police draws up a record (a "protocol", a term which we shall use hereafter for similar documents) of the making of the statement. If there are grounds for starting a criminal case, the police officer (or his direct superior officer) decides accordingly (art.185 CCP). This decision should contain the most important elements of the crime reported, including the provision of the Criminal Code under which the case is started (art.186 CCP). It also contains an indication of further action to be taken. In most ordinary criminal cases, such as rape, the case is then directed to a special police investigating officer or investigator (art.189 CCP).

The officer receiving the Sai statement, D.S. Ospanov, reported the event a few minutes later to a (higher?) police officer (I.Zh. Musrepov), who ordered investigator G.T. Zhakupova to investigate the matter. The investigator (art.194 CCP) should then take a decision to start a preliminary investigation and this was done the same day (28 October).

Without waiting for the beginning of a preliminary investigation, certain measures can be taken, including the detaining (*zaderzhanie*) of the suspect. As the acceptance of the Sai statement had started the criminal case against Duvanov, he was now a suspect, and the seriousness of the crime involved would allow his detention.

A police team was sent in the morning of 28 October to Duvanov's residence from the Karasai police post, accompanied by Sai and Kapeliushina to show them the way; investigator Kapeliushina had joined them in the meantime. Duvanov was ordered to accompany the police officers back to the police post and was not allowed to go in his own car. It is obvious therefore that he was detained (*zaderzhan*) in the sense of art.132.

*Duvanov was interrogated for the first time the next day. This is impossible to reconcile with the requirements of art.134 CCP, which provides that a full protocol of the detaining act (legal*

*grounds, reasons, precise time and place, results of personal search, and time of protocol) must be drawn up within three hours after arriving at the police station and that the protocol must be communicated to the person detained, with an explanation of his rights, including his right to invite counsel. The explanation given (: that he had been brought in as a witness) lacks credibility in view of a) the seriousness of the case opened against him, b) the fact that he had been brought against his will, and c) the fact that he had been subject to a personal search.*

A suspect may not be detained for more than 72 hours (art.138 CCP). The Duvanov case would fall into the bracket of more serious cases where the subsequent measure of arrest (*arest*) is allowed. This requires the approval of the procurator (art.150 CCP).

Although Duvanov was *de facto* under arrest from the moment the police took him from his home in the morning of 28 October, he was officially detained only on the next day and this detention was changed into arrest on 31 October.

*Preliminary investigation*

The preliminary investigation was started by lieutenant-colonel of police G.T. Zhakupova on 28 October, as stated, but the investigation was taken over by police major E.K. Abdrakhmetov on 5 November. The purpose of the preliminary investigation is to collect sufficient evidence to formally charge the defendant, and to be able to proceed to the main – judicial – investigation at the trial. The preliminary investigation is conducted by a special official, the investigator (*sledovatel'*), who is supervised by the procurator (art.197 CCP). The investigator has a number of instruments at his disposal to collect the evidence required: he may interrogate the defendant, summon and interrogate witnesses, conduct searches, seize property, order inspections, confrontations, etc., request expert evidence, etc.

Before proceeding to one of these investigative actions, the investigator must explain to the persons involved in these actions their rights and duties (art.201 CCP).

In a case of rape, the most important evidence will normally consist of the testimony of the victim, expert scientific evidence, and material evidence (clothes, etc.), and possibly also the testimony of witnesses.

Investigative action is taken on the basis of a formal decision of the investigator, which must be recorded (art.207 CCP). Of the action itself (*e.g.* an interrogation, a search), a protocol is drawn up. This protocol is shown to the persons who took part in the action; they are entitled to append their observations to the protocol (art.203 CCP).

Among the investigative actions taken in the Duvanov case, the following were the most important:

*Interrogations.* General rules on interrogations in arts.211-213 CCP. The person to be interrogated must be summoned. Interrogations may not last more than 4 hours at a stretch and may not be conducted during night-time, barring exceptional circumstances. Leading questions are forbidden. If the witness or victim is under age, his legal representative may be present.

*The interrogation of Duvanov himself.* The (first) interrogation of a suspect must take place within 24 hours after his arrest (art.216 CCP). Once the suspect has been presented with the accusation and he thereby has become the accused, he must again be questioned within 24 hours (art.217 CCP). In both cases the defendant (suspect or accused) must be informed of his rights before the beginning of his interrogation. The defendant is entitled to receive copies of a number of procedural documents (art.69 CCP). The right to defence counsel arises once a person has become a suspect or an accused (art.70 CCP). Participation of defence counsel is obligatory when the suspect or accused so demands

(art.71 CCP). Defence counsel is entitled to have private and confidential meetings with his client, unrestricted as to length and frequency, and to be present at the interrogation of his client (art.74 CCP).

*It would appear that Duvanov's rights in this respect were substantially violated a number of times during the preliminary investigation.*
*His request to be assisted by counsel was satisfied only after considerable delay.*
*His meetings with counsel usually took place in a room (Room 6) that was generally known to be subject to video- and audio-supervision.*
*Time limits provided by law were not always observed.*
*The meetings were not always unrestricted in time and frequency.*
*Counsel was not given the possibility to be present at the first interrogation of his client.*
*Duvanov's request to receive copies of relevant documents was at least once refused.*
*Duvanov's lawyers filed a complaint to the Karasai District procurator, requesting criminal prosecution of chief investigator E. Abdrakhmetov for obstructing the legitimate activity of defence counsel. When this request was not taken into account, they filed a new request to the Procurator-General of the Republic, without success.*

*The interrogation of the victim.* The interrogation of Kapeliushina conducted on 28 October was videotaped and the videotape was subsequently the object of a psychological expert examination, in order to evaluate the credibility of Kapeliushina's statements (expert testimony No.14970).

*The interrogation of witnesses.* The testimony of the following witnesses was used by the trial court in establishing the chain of evidence leading to the conviction of Duvanov.
    A.E. Cherkasov, Duvanov's neighbour, whose non-verbal communication with the latter at the time of the arrest was interpreted as an admission of guilt by Duvanov
    T.V. Asmus (Tatyana), Cherkasov's 14-year old stepdaughter and Kapeliushina's friend. She was present at Duvanov's dacha during the earlier part of the evening before the alleged rape took place.
    R.B. Baiseitov and N.A. Adil'bekov, who picked up Kapeliushina during the night after the alleged rape took place and drove her to Almaty.
    D.S. Ospanov, the duty officer at the Karasai police station, who took down the initial statement by I. Sai that a rape of her daughter had been committed.

*Expert testimony.* Expert opinion may be requested, and must be requested in certain cases (see art.241 CCP), when the establishment of circumstances relevant to the case require special scientific expertise (art.240 CCP). Expert opinion is requested by the investigator by means of a special decision, the contents of which are defined in art.242 CCP. Participants in the case may also propose to the investigator to request expert opinion, indicating the questions to be asked and the materials to be examined; they may also suggest names of possible experts. The investigator is bound to satisfy such demands, unless he is of the opinion that the questions suggested are not relevant to the case or not subject to the expertise of the expert concerned (art.242 point 2). The defendant and the victim have a number of rights concerning information on and participation in the production of expert opinion, both before, during and after the opinion is acquired (art.244).
In the Duvanov case a large number of expert opinions was requested by the investigators (15 or more). We shall mention here only those that were referred to in the judgment of the trial court:

No.583 (28 October 2002): forensic-medical examination of Kapeliushina the day after the alleged rape;

No.14970 (25 November 2002), criminalistic-psychological analysis of the videotaped interrogation of Kapeliushina, with a view towards the credibility of her statements;

No.14705 (11 November 2002), psychiatric-psychological examination of Kapeliushina, with a view towards her general mental health;

No.14951 (22 November 2002), criminalistic examination of a tear in Kapeliushina's bathrobe;

No.04-05/247 (29 October 2002), forensic-medical and biological examination of blood and/or sperm on Kapeliushina's bathrobe and knickers, on a swab and gauze with vaginal secretion, a swab taken from Kapeliushina's oral cavity, blood and saliva from Kapeliushina and Duvanov, underpants, shorts and a shirt of Duvanov;

No.14682 (25 November 2002), DNA-analysis of Duvanov's blood and of sperm found on Kapeliushina's bathrobe, knickers and on the vaginal swab;

No.06-02-04 (1 November 2002), forensic-medical examination of Duvanov's blood, saliva and urine, to establish the presence of narcotic substances;

No.14311 (1 November 2002), forensic-chemical analysis of glasses, drinks and foodstuffs, to establish the presence of narcotic or psychotropic substances;

No.14292 (31 October 2002), chemical analysis of vodka and wine bottles to establish the presence of narcotic substances;

No.14629 (31 October 2002), micro-fibre analysis of articles of clothing of Duvanov and Kapeliushina;

No.14592 (1 November 2002), dactyloscopic analysis of glasses and bottles from Duvanov's dacha;

No.109 (15 November 2002), forensic-medical examination of Duvanov, with a view towards his capacity to have normal intercourse.

Additional expert opinion was sought by the defence from the prestigious Russian Centre of Forensic-Medical Expertise in Moscow. The most important Kazakh expert opinions were submitted to a review by specialists from the Moscow institute. As a result the Russian specialists delivered critical reports on expert opinions Nos.04-04-247, 14682, 14292, 06-02-1004, 583 and 104.

*Among the items to be included in the investigator's decision to request expert testimony, art.242 CCP mentions "the reasons [osnovaniia] for requesting expert testimony". In all cases which we inspected the following formula was employed:*

*"The investigator [name, place, etc.] established [ustanovil(a)] that [time, place] Duvanov raped the minor girl K. Kapeliushina."*

*There is no need to argue that such a decision, also in Kazakh criminal procedure, is the exclusive competence of the court. The defence lawyers have therefore protested consistently against this formula as violating the principle of the presumption of innocence, recognized in art.19 CCP. When we put this question to members of the procuracy, their defence was to point to the warning included in all requests for expert testimony, that conscious presentation of false testimony was forbidden. This is quite insufficient in our opinion. It makes it more difficult for the expert to be unprejudiced when he has already been told what he is supposed to find.*

The processing of materials subject to expert examination is regulated in detail by arts.256-264 CCP. The significance of these rules derives from art.128 CCP ("Evaluation of evidence"), which provides a.o. that evidence must be admissible, *i.e.* that "it has been received in the manner established by this Code". According to the Commentary this means that evidence is admissible when its source and the manner of acquiring it are legitimate (= according to law), it has been

presented in the appropriate procedural form, and the activities connected with its acquisition have been performed by a person, competent to perform such activities.

*The defence lawyers filed a number of procedural complaints against several expert opinions, in the course of the trial, mainly on the basis of the non-observance of procedural requirements. Several defence requests, made in the course of the preliminary investigation, to acquire new or additional expert testimony were made, but all of them were refused. They concerned a request for an analysis of Duvanov's blood, to establish the presence of narcotic or psychotropic substances (request of 29 October 2002), for a forensic-biological examination of under-nail substance of Duvanov, and for a dactyloscopic analysis of the biographical note written by Kapeliushina (in order to establish whether Duvanov's fingerprints were on the note). The refusal of these requests is difficult to explain in view of art.242 point 3 CCP.*

*Among the multitude of expert opinions, one examination is conspicuously absent: a prompt medical examination of Duvanov. Defence counsel petitioned unsuccessfully for an examination of Duvanov's blood at the very beginning of the preliminary investigation (29 October 2002). Considering that a prompt medical examination of a person accused of rape may produce incontrovertible evidence of his innocence, the omission of the experienced investigator in this respect is hard to understand.*

Of the expert opinion mentioned above, the following turned out to be most crucial in the case; they therefore deserve some comment.

No.04-05/247: a forensic-medical and biological examination of swabs and articles of clothing. This examination established the presence of sperm, two days after the alleged rape, in the vagina of the victim. According to the Russian re-examination, the original examination was incomplete and therefore inconclusive. During the trial, the procedure followed during the packing, despatching and unpacking of the samples involved was criticized, but not completely cleared up.

No.14682: DNA-analysis of Duvanov's blood, sperm and saliva. This analysis established that in all probability, approaching certainty, the sperm found on the vaginal swab taken from Kapeliushina was Duvanov's. This analysis was also criticized as technically incomplete by the Russian specialists. The legal procedures for handling the samples were also not properly observed, according to the defence lawyers.

Nos.06-02-1004, 14311 and 14292: various investigations to establish the presence of various narcotic or psychotropic substances in Duvanov's blood, on bottles, glasses etc. Nothing was found, but the examinations were criticized in the Russian reports and by the defence lawyers, who argued that the experts had not been looking for the right thing. The fact remains, however, that nothing was found and the allegation that Duvanov had in some way been drugged remained uncorroborated.

Expert examination No.583 is of considerable relevance in some respects. In this general forensic-medical examination of Kapeliushina, conducted on 28 October 2002 (the day after the alleged rape), only very insignificant bruising of the body was observed, some slight irritation of the labia majora, and a hymen which had apparently not been intact for a certain length of time. This was subsequently explained by Kapeliushina, who maintained throughout that she had been a virgin until 27 October 2002, as the result of the improper use of Tampax sanitary pads. A separate expert report, No.104, asserted (without any examination or experimentation) that such a result was not to be excluded.

*Search and seizure.* A search may be ordered by the investigator if there is sufficient reason to assume that certain objects or documents are present at the place to be searched (art.230 CCP). This