should be recorded in the decision to effect a search (art.232 and Commentary). It is clear from these provisions (and the Commentary) that the investigator must indicate beforehand what he is looking for. If, however, in the course of the search, objects or documents "relevant to the case" (art.232, point 13) are found, then they may also be seized.

A search of Duvanov's dacha took place on 30 October 2002, ostensibly with the intention of looking for and seizing objects of clothing, furniture, etc., which would be relevant in connection with the rape charge. In the course of the search a piece of paper with some of Kapeliushina's handwriting on it turned up, and this piece subsequently played a major role in the case (see below), although its existence and presence at the place of search had not been included in the decision to conduct a search.

Search and seizure require the presence of eye-witnesses (see art.86 CCP, *poniatye*, as independent guarantors of the correctness of the procedure, to be distinguished from ordinary witnesses – *svideteli* -, who testify about what they know in connection with the case and are therefore a direct source of evidence, see art.82 CCP).

*Duvanov was apparently not informed of his rights before the search commenced. At the trial his lawyers requested to remove the objects seized during the search from the evidentiary material, but this request was rejected by the court. Another reason to contest the legality of the search was that the witness Cherkasov served simultaneously as an eye-witness at the search. Eye-witnesses should be "not interested in the case", but it is not clear from the CCP or the Commentary whether an ordinary witness is* per se *to be considered as interested in this sense. Other irregularities were also reported as having taken place during the search.*

*Confrontation* (art.220 CCP). When the testimonies of two persons who have been interrogated do not agree, a confrontation may be ordered by the investigator, or requested by one of the participants in the trial. After a first confrontation between Kapeliushina and Duvanov, which was videotaped, the defence requested a second confrontation in connection with Kapeliushina's note, found during the search on 30 October 2002. This request was granted.

*Investigative experiment* (art.239 CCP). An investigative experiment may be conducted in order to check statements or facts relevant to the case. The defence requested such an experiment in connection with Kapeliushina's allegation that Duvanov had pulled down her knickers to her knees, before raping her. The defence argued that, considering the size and elasticity of the garment, rape would have been impossible under those circumstances. The request was refused, however.

*The indictment*

Once the investigator has reached the conclusion that he has completed the collection of the evidence required, he closes the preliminary investigation and informs the defendant, his counsel and other parties accordingly. Everybody is then entitled to study the case materials and, if so desired, request additional investigative actions (arts.273-277 CCP). When there are no further complaints or requests, the investigator draws up the indictment, the document which serves to initiate trial proceedings. The indictment is sent immediately to the procurator, who has to deal with it within ten days. The procurator may amend the indictment; after he has approved it, the indictment is sent on to the competent court (arts.278-284 CCP). At the trial, the indictment is the first document which is presented (in summarized form) and it remains the central document around which the trial revolves until the court issues its judgment.

The indictment must indicate the acts which the defendant is said to have committed and their legal qualification, in other words, which offence as defined by the Criminal Code of Kazakhstan these acts constitute (art.278 CCP). When the procurator reviews the indictment, the first question he is required to check is "whether the act with which the accused is charged did take place, and whether this acts constitutes a criminal offence" (art.281 CCP). At the end of the trial, the first questions the court has to answer are: "has it been proved that the act with which the defendant has been charged took place" and "does this act constitute a criminal offence and by which precise provision of the criminal law (article, section, point) is it covered" (art.371 CCP).

The precise wording of these provisions is important, because Kazakh criminal procedure apparently does not make use of the institution of alternative or subsidiary indictments, as known in many continental jurisdictions (there are no references to such devices in the CCP, neither in the Commentary).

The Duvanov case illustrates the special problems which arise in connection wiht this procedural anomaly. The indictment charged Duvanov with knowingly raping an under-age girl, qualifying this offence correctly as the crime covered by art.120 section 2 point "d" [fifth letter of the Russian alphabet] of the Kazakh Criminal Code.

The court, as mentioned before, did not accept that Duvanov was aware of the fact that Kapeliushina was a minor, and need not have been aware of it, and convicted him therefore of the crime defined by the first section of art.120 of the Criminal Code, simple rape ("sexual intercourse with the application of force or the threat of application of force against the victim or against other persons, or by abusing the helpless situation of the victim").

As we shall see below, the evidence for the use of force is open to doubt, and then the question becomes unclear. If force could not be proven, then there would be no rape; the act with which Duvanov had been charged (rape) would not have taken place and an acquittal would be inevitable. Nevertheless (presuming for a moment that Duvanov had been aware of the fact that Kapeliushina was only 14 years old at the time), a crime would have taken place according to Kazakh law (art.122 of the Criminal Code, sexual intercourse with a person who has not reached the age of 16). But as Duvanov had not been charged with such an act, no conviction could follow. Or perhaps rape could be regarded as a composite act (sexual intercourse + compulsion) and then the court could have found (in the Duvanov case) that sexual intercourse had taken place, but that it had been consensual or that in any case it could not be proven that Duvanov had forced or compelled Kapeliushina to have sex with him. All such problems could have been avoided if there would have been an alternative or subsidiary charge of sexual intercourse with a person under 16 years of age.

## Trial

### Pre-trial hearing

The trial court may hold a pre-trial hearing in a closed session, in order to decide various preliminary questions or deal with complaints of one of the parties (arts.299 and 301 CCP).

The defence requested such a hearing on 5 December 2002, in order to deal with its complaints about serious violations of criminal procedure, but this request was rejected by the court.

A second request (of 16 December 2002) to re-open the preliminary investigation -- which would have required a pre-trial hearing -- was also rejected by the court.

### The trial record (protokol)

The main provision dealing with the trial record is art.328 CCP, which describes the contents of the trial record (*protokol*) and the way is to be drawn up. Arts.329-330 outline the procedure for objecting against the protocol. The CCP does not directly define the legal status of the trial record and this has to be derived from the two references made to the trial record in the chapter dealing with appellate procedure.

Sound- and video-recording of the trial is possible, but a decision is apparently within the competence of the court. A request for sound-recording by the defence was rejected. If recording is allowed, the corresponding information carriers (tapes, disks, etc.) are attached to the trial record (art.328).

Art.410 CCP ("Powers of the appellate court") allows the appellate court to interrogate witnesses "In the case the statements of witnesses (victims) in the trial record are unclear and [if such statements] are [to be] further explained." This suggests that the trial record, as a rule, is the basic authoritative source concerning what took place during the trial. This of course is fully in accordance with the legislative arrangements of most countries where the trial court is considered as supplying complete evidence of anything that happened at the trial. It is also confirmed by the Commentary, which states (under art.328): "Appellate and supervision courts check the correctness of judicial actions during the trial, and the conformance of the judgment to the facts established during the trial, on the basis of the trial record."

The other provision in the CCP which deals with the relevance of the trial record during appellate proceedings is art.415 ("Essential violation of the law of criminal procedure"). An essential violation of the law of criminal procedure is one of the grounds for setting aside or amending the judgment of the trial court (art.412 CCP). Among the most serious violations of the law of criminal procedure, leading to mandatory repeal of the trial court judgment, art.415 mentions the absence of the trial record.

The trial record, in accordance with general continental practice, need not be a verbatim reproduction of what was said at the trial (see Commentary to art.328); it must, however, provide a truthful and adequate account of all legally relevant statements and events of the trial hearing. If it fails to do so, it cannot fulfil the tasks assigned to it in appellate proceedings.

*In the Duvanov case, the defence, exercising its right under art.329 CCP (referred to above), had objected to a number of items in the trial record, one of their points being that the answers given by witnesses, experts, victim, and defendant were recorded, but that the questions to which they replied were missing. These objections were not accepted by the trial judge (as he might have done under art.330), as we could establish by inspecting the authentic trial record, where the questions were indeed missing.*

*We are of the opinion that the complete absence of the questions posed to witnesses, victim, defendant, etc. in the trial record affects the quality of the latter to such an extent that one might assume the constructive absence of the trial record. The most relevant statement of the Commentary in this matter is (under art.328): "The absence of the trial record, as well as its careless composition depriving the higher courts of the possibility to check the legality and well-foundedness of the judgment, leads to the setting aside of the latter as unfounded."*

*Even if one takes into consideration that the non-insertion of the questions, as referred to above, may be standard practice in Kazakh criminal procedure, and that it therefore would not have occurred to the trial court and its secretary (who is primarily responsible for drawing up the record) that they were acting contrary to the law, the point had been made again forcefully by the defence in their appeals, and the appellate court should therefore not have failed to address the matter.*

*The conclusion should therefore be that the legality of the appellate procedure in the Duvanov case, and* ipso facto *also of the judgment in appeal, are in serious doubt.*

## Outline of the trial

| | |
|---|---|
| 24 December 2002 | Opening, preliminaries and various motions |
| 6 January 2003 | Begin of judicial investigation, interrogation of Kapeliushina |
| 7 January 2003 | Interrogation of I. Sai, mother of Kapeliushina; of witness Cherkasov |
| 8 January 2003 | Interrogation of Sai; of Adilbekov (car passenger); of Musrepov (duty officer Almaty police); of Ospanov (duty officer Karasai police) |
| 9 January 2003 | Interrogation Galiapina (Duvanov's sister-in-law); of Zhetpisbayev (Karasai police); of Imanalieva (dep. chief Karasai police); of Saginbekova (investigator Karasai police); of Manabayev (Karasai police) |
| 13 January 2003 | Interrogation of Malyarchuk (friend of Duvanov); of Valiyev (Karasai police); of Ospanov (Karasai police); of Baiseitov (driver); of Baiseitova (driver's wife); of Sagitov (investigator Karasai police); of Zhakupova (chief investigator); of Popov (eye-witness to search); of Fedyanin (friend of Duvanov); of Shaibekov (not interrogated by mutual agreement; does not speak Russian) |
| 14 January 2003 | various motions; interrogation of Dzhakishev (police colonel); of Nyukhova (friend of Duvanov); of Bektasov (police colonel); of Turmaganbetova (friend of Duvanov); of Zlotnikov (friend of Duvanov); of Taukina (friend of Duvanov); of Dyorin (ex-policeman; one-time landlord of Sai & Kapeliushina); of Gusakov (acquaintance of Kapeliushina from Karaganda); |
| 15 January 2003 | various motions; videotapes shown (conversation of Kapeliushina's friends; interview of one of the girls by police in presence of parents); interrogation of Duvanov |
| 16 January 2003 | Interrogation of experts; of Kasymov (eye-witness of search); of experts; of Iskakov (neighbour); of Vodyanova (neighbour) |
| 20 January 2003 | Interrogation of experts |
| 21 January 2003 | Interrogation of experts |
| 22 January 2003 | Interrogation of experts; various motions |
| 23 January 2003 | Various motions; defence lawyers withdraw |
| 24 January 2003 | New defence lawyer appointed |
| 27 January 2003 | Closing statements by prosecution lawyers and new defence lawyer |

We are in possession of reasonably complete records of these proceedings. In the official record, as mentioned, the questions are absent as a rule. This defect is corrected by the availability of a trial record prepared by the defence, in which the questions have been included. Additionally, an extensive report on the trial prepared by diplomatic observers at the trial provides a useful source. The following hiatus occur in our collection:
missing in the official trial record: sessions of 8 and 16 January 2003
missing in the defence record: sessions of 24 and 27 December 2002, of 23, 24, 27, and 28 January 2003
The diplomatic report covers every day of the trial, but its coverage is much less detailed.

## The course of the judicial investigation

The general line of the judicial investigation has been indicated above in the outline of the trial: after dealing with a number of preliminary issues, the principal witnesses who established the case for the prosecution were heard; then the witnesses summoned or requested by the defence, and then the expert witnesses. All this was interspersed by complaints, objections and requests made by both sides. The defence proposed about 70 of such interventions during the trial phase. Most of these concerned the admission of new evidence, or the rejection of evidence presented by the prosecution. The main thrust of these interventions was the rejection of expert evidence, allegedly acquired in an irregular manner. Among the expert testimony contested in this way were the Nos.14629, 14292, 583, and 15629. These requests were all refused.

A defence request for a new expertise concerning the possibility of sexual intercourse under the circumstances described by Kapeliushina was also refused.

The defence was more successful in its requests for the summoning of witnesses. The court agreed to have the neighbour's wife, Cherkasova, summoned, as well as her daughter Tatyana Asmus, a friend of Kapeliushina. But when they did not turn up, the court allowed to have their statements read out, against the objections of the defence, who insisted that they they should have been brought to court.

The video-recording of a statement by I. Belikova, an acquaintance of Kapeliushina from the city of Karaganda, was also allowed; this statement was generally unfavourable to Kapeliushina.

A not insignificant role was played in the trial by the Russian expert reports mentioned above. They were finally admitted in evidence as "consultative" opinions.

Defence counsel continued their energetic defence of Duvanov during the trial, by requesting criminal investigation against law enforcement officers, the termination of all proceedings against their client on account of gross violations of rules of criminal procedure, the removal of the judge for lack of objectivity, and, finally, at the end of the trial, by threatening to withdraw from the trial if proceedings against their client would not be terminated. All these requests were turned down and a state-appointed defence attorney replaced the defence team at the final phase of the trial.

Duvanov, under these circumstances, did not make use of his right to have the last word at the trial.

*The judgment*

The judgment can be summarized as follows.

Introductory part (persons, time, place, criminal charge)
Resolution: Duvanov raped Kapeliushina on 27 October 2002, shortly before midnight. Then the circumstances are explained in more detail.
Duvanov's version of the events is given.
This version if rejected for the following reasons:

> Kapeliushina's version of the events, confirmed by the statements of her mother.
> Psychological expert opinion (No.14970) confirms the credibility and trustworthiness of Kapeliushina's statement.
> Cherkasov's testimony, that he asked Duvanov, while the latter was being questioned by policemen in his dacha, through gestures whether he had indeed raped Kapeliushina, and that Duvanov had nodded his head in affirmation.
> The statement of the neighbour's daughter Tatyana Asmus, about the events during the day leading up to the alleged rape.
> The statements of Baisetov and Adil'bekov who had taken Kapeliushina to her mother's home in Almaty in the early hours of 28 October.

The statement of the police duty officer Ospanov, who had received the statement reporting the rape, made by Kapeliushina's mother I. Sai, early in the morning on 28 October.

Forensic-medical report No.583, detailing the injuries of Kapeliushina.

Forensic examination of Kapeliushina's bathrobe (No.14951) and the tears occurring in it.

Forensic-medical and biological examination of blood and sperm (No.04-05/247), establishing the presence of sperm in Kapeliushina's vagina.

DNA-analysis of Duvanov's blood and sperm, establishing the identity with the sperm encountered in the vagina (No.14682).

These reasons simultaneously present the chain of evidence, leading to the establishment of Duvanov's guilt.

The objections of the defence against expert opinions Nos.04-05/247, 06-02-1004, 14311, 14292, 14629, 14592 and 14682 were rejected; the procedural violations, if any, were not serious. The experts were qualified and reliable.

The Russian expert reports were only to be regarded as recommendations or consultations.

Expert examinations Nos.06-02-1004, 14311 and 14292 did not provide any corroboration for the defence's allegation that Duvanov had been drugged.

Expert opinion No.109 established that Duvanov was able to have normal sexual intercourse, that sexual intercourse against the will of the man was highly unlikely, and that sexual intercourse by an unconscious man was impossible.

The story of the underpants was rejected as an evasion, concocted afterwards (Duvanov had originally stated that he had been wearing underpants under his shorts. During the trial he asserted that he had in fact not been wearing these, but that he had included the statement at the advice of his defence lawyers. The underpants were found to have sperm stains, and if Duvanov was right this would of course imply the falsification of evidence.)

Duvanov's claim that the case against him was a fabrication was rejected. There was an innocent explanation for the police press conference the evening of 28 October. (At this press conference the speaking notes of the police officer turned out to have been sent from the capital Astana in the morning, through the fax machine of the presidential administration.)

There had been some procedural violations, but these were not of a sufficiently serious nature to damage the case of the prosecution.

The court rejected, however, the position of the prosecution that Duvanov knew or should have known about the victim being under age. The note on which Kapeliushina had written her age was found during a search which was grossly irregular.

For this reason Duvanov should not be convicted under art.120 part 2 of the Criminal Code of Kazakhstan (qualified rape, in this case rape of a minor), but under art.120 part 1 (ordinary rape).

The sentence was therefore 3 years and 6 months of deprivation of freedom in a labour colony of the general regime.

In the final part of the judgment Duvanov was also ordered to pay 152600 tenge (roughly Euro 900) for the expert opinions; furthermore the judgment indicated what was to be done with the properties which had been seized during the investigation (most of them to be returned to their owners, material evidence to be destroyed, videotapes to be kept with the case file).

*Some observations regarding the judgment*

In case of rape, the central piece of evidence is always the statement of the victim, although this statement must always be corroborated by other evidence. Usually, the victim knows the attacker and then no additional evidence is required to identify the defendant (as in the present case).

Satisfactory corroborating evidence should prove two facts, essential to the crime of rape: that sexual penetration took place (leaving aside more extensive definitions of rape, which would also include such actions as oral rape, etc.), and that this penetration was forced upon the victim, either by force or by threats. The definition of rape in the Kazakh Criminal Code (art.120) is: sexual intercourse with application of force or with the threat of such application against the victim or other persons, or by abusing the helpless situation of the victim.

In the Duvanov case we have a) the statement of Kapeliushina that she had been raped by Duvanov, b) Duvanov's sperm in Kapeliushina's vagina (indicating penetration), c) Kapeliushina's injuries. Let us look at these points in more detail.

The value of Kapeliushina's statement depended largely upon her credibility or trustworthiness. In this respect the court restricted itself largely to a reference to the psychological report which asserted that Kapeliushina's statements appeared to be truthful. However, the value of such a report can be doubted, because a single lie by the subject would already undermine it. In this case there were so many indications that Kapeliushina lied rather regularly about many things, that the report must be considered worthless. Kapeliushina lied repeatedly about her age, her schooling, her smoking, her use of make-up, etc. When she was asked to relate what happened in the dacha after other people had left, inconsistencies about details occurred several times. She either did not remember such details (her usual excuse) and apparently made up answers on the spur of the moment, or she appeared to give the answer which she thought most suitable at the given moment.

**Our provisional conclusion has to be that the court did not have sufficient reason to assume that Kapeliushina would be speaking the truth.**

The presence of sperm in the vagina is perhaps the most damning piece of evidence, but at the same time it does not prove rape of course. The defence tried unsuccessfully to remove this evidence by attacking the procedural propriety of the way it had been acquired. This may be legally effective, provided a serious procedural violation can be proved, but it lacks moral persuasiveness, a factor which was of considerable importance in the Duvanov case, in view of the public interest in it.

When Duvanov was questioned on this point during the trial, he replied that the presence of the sperm, which he could not explain, actually indicated that there was a plot to set him up. We shall return to this question in our review of the defence's version of what happened. For the time being one may admit that the presence of the sperm in the vagina was a powerful argument in the prosecution case.

It would of course need the additional element of force or threats to constitute rape. The evidence is weak again on this point. There were a few small bruises (discolouration of the skin, without the skin being broken), but they could have been caused by all kinds of factors. The Russian expert report, which was not accepted as evidence by the court, was inclined to regard the insignificance of the injuries as inconsistent with rape. The redness of the labia majora could very well have been caused by sexual intercourse, but do not suggest the use of violence. In short, the only serious indication of the use of force is the statement of Kapeliushina that she was raped. And that is not worth much in this case, as we have seen.

Defective evidence of rape can of course easily be repaired once there is a confession. In the Duvanov case a confession of sorts was constructed in the judgment out of the non-verbal communication between Duvanov and his neighbour Cherkasov, when Duvanov was surrounded by policemen at his dacha in the morning of 28 October. In the words of the judgment: "Through a gesture with his head he kind of asked S.V. Duvanov whether the latter had raped the girl, to which S.V. Duvanov by nodding his head gave him to understand that he had done so." This is apparently based on a similar statement made by Cherkasov, according to the trial record. It is difficult to evaluate the usefulness of this statement. At the trial Cherkasov, when prompted by Duvanov's lawyers, was unable to reproduce the gesture he claimed he had made to Duvanov. Moreover, it

remains questionable whether Cherkasov interpreted Duvanov's non-verbal reply correctly, and even whether Duvanov actually made the gesture at all. At the trial Duvanov stated that he may have nodded in greeting to Cherkasov. The whole episode seems to be of very low evidentiary value.

All the other evidence adduced during the trial and referred to in the judgment concerns circumstances surrounding the main event and does little or nothing to strengthen the case for the prosecution.

**Our overall evaluation of the evidence in its totality (this is also the formula employed in art.128 CCP: "The evaluation of evidence") is that it was insufficient to lead to a conviction for rape, as charged.**

Perhaps the most striking point of the judgment was its rejection of the prosecution's position that Duvanov had known or should have known that the victim was under age. This unusual departure was based by the court solely on the rejection of the notorious note of Kapeliushina in which she had stated her age. This implies that the court tacitly accepted that Kapeliushina could easily be taken for an 18-year old. Although Kapeliushina had dressed herself in a more childish fashion (and accordingly to some observers at the trial, even in an exaggerated and slightly ridiculous manner), her normal attire was indeed such that she appeared quite grown-up. This impression was re-inforced by her general demeanour and body language, as we were able to observe in lengthy fragments of video recordings of interviews with her. She was also in the habit of giving her age as 18.

### Appellate Hearing

*Appeals*

Appeals against the judgment of the Karasai District Court were filed by defence lawyers Voronov and Sarsenov, by the procurators Mirazov and Sharapa (such an appeal is termed a protest), by advocate Martynovskii on behalf of Kapeliushina, and by Kapeliushina, her mother I. Sai and their lawyer Nurshin together. All appeals were filed within the period of ten days. On 3 March 2003 Sarsenov and Zhovtis filed additional arguments to the two appeals filed by the defence, making use of the possibility to do so, provided by arts.401 and 409 CCP.

The appeals filed by the defence requested the appellate court to reverse the original judgment against Duvanov and release him. The two appeals, together with the additional arguments, offered a long list of objections to the judgment, claiming that a number of evidentiary items were unconvincing or even downright worthless, that other evidence had been acquired in an improper manner, and that the court failed to take into consideration a number of arguments of the defence which were of great significance for the outcome of the case. The protest by the procurators maintained that the search conducted on 30 October 2002 was valid and that Duvanov had been aware of the fact that Kapeliushina was under age; they requested therefore that the offence should be qualified as aggravated rape (rape of a minor, as defined in art.120 sectio 2 point "d" of the Criminal Code) and that the sentence should be increased to seven years of deprivation of freedom. The lawyers appearing for Kapeliushina also argued in their appeals that Duvanov had known about Kapeliushina's age and that he should therefore be convicted of the rape of a minor; they further argued that no mitigating circumstances should come into consideration. The penalty for ordinary rape (first section of art.120 of the Criminal Code of Kazakhstan) is between three and six years of deprivation of freedom; for aggravated rape as defined in the second section of the same article, the penalty is between four and ten years.

*Judgment*

The appellate procedure constitutes in principle a full examination of the correctness of the first trial: whether the facts of the case have been established correctly and the criminal law has been applied correctly, whether the provisions of the law of criminal procedure have been observed, and whether the judgment is in accordance with the law and well-founded. These checks are carried out by the appellate court on the basis of the materials of the case and additionally presented materials (art.405 CCP). The appellate court consists of three judges, of whom one serves as judge-rapporteur. The judge-rapporteur has studied the materials beforehand and is the first one to present his findings during the hearing of the appeals. Then the procurator has the floor to explain his protest, followed by the other parties in the procedure.

In fact, as we had been advised beforehand, the outcome of the appellate procedure seems to depend to a great extent on the preparatory work done by the appellate court. The actual hearing consists of little more than the parties summarizing their written appeals and is over in a few hours. In the Duvanov case the appellate hearing started on 11 March 2003 at 10.00 hrs in the Almaty Province Court in the provincial capital of Taldy-Kurgan (some 300 km North-East of Almaty).The first hour or so must have been taken up with deliberations concerning the admission of observers and the question of whether the hearing was going to be closed or not (this matter has been discussed above). The decision that the hearing would be closed and that no outsiders whatsoever would be admitted was announced around 11.30 hrs. Taking into account the lunch-break, the actual appellate hearing will not have taken more than about three hours; the judgment was announced in open court later on in the afternoon. Only the introductory part and the resolution were read out; when we visited Taldy-Kurgan one week later (on 18 March) we were able to acquaint ourselves with the full judgment in appeal.

In the judgment, a number of the objections against the trial court judgment, as raised by the defence, was addressed, but by no means all of them. In some cases the appellate court argued that the defence had failed to provide serious corroboration for their statements, *e.g.* the allegation that Duvanov had been drugged, or that the package in which his sperm sapmples had been sent to the experts had been tampered with. In other cases the court referred to evidence which contradicted the arguments of the defence.

The most surprising aspect of the judgment in appeal was that the prosecution argument that Duvanov had been aware of the age of Kapeliushina was accepted and that the offence was accordingly requalified as the rape of a minor. But the appellate court corrected the judgment of the trial court on another point as well. It held that the trial court had erroneously not taken into consideration that there were mitigating circumstances. Such circumstances are enumerated in art.54 of the Criminal Code of Kazakhstan; the enumeration is not exhaustive and the court may therefore consider other circumstances as well. The appellate court referred to the fact that Duvanov was a first offender, that he was well regarded by many people, that he was a journalist, etc. By taking such mitigating circumstances into consideration, the court felt that a penalty below the minimum prescribed by art.120 section 2 of the Criminal Code (aggravated rape) could be imposed and consequently stuck to the original sentence of three years and six months. The possibility to impose , in exceptional circumstances, a sentence below the minimum provided by law is provided by art.55 of the Criminal Code.

*A brief evaluation of the judgment in appeal*

Apart from the points mentioned in the previous paragraph, the judgment of the appellate court follows the path laid out by the judgment of the trial court. A seemingly greater effort has been

made to take the objections of the defence into account, although this had been done in an extremely formalistic way. Most objections are rejected on the basis of statements by Kapeliushina, Sai and Cherkasov, although the reliability of these has been seriously contested by the defence. We find it hard to understand that the story of Kapeliushina's note, which had seemed most suspicious to many outsiders (including ourselves) and which even the trial court had refused to accept, was rehabilitated by the appellate court. The overall impression left by the appellate court judgment is one of wooden unwillingness to pay serious attention to the arguments advanced by the defence.

**Further possibilities**

The judgment of the appellate court is final, which means that the person convicted will start serving his sentence and that the other decisions taken in the case and not reversed by the appellate court will also be carried out. This is of particular importance in the Duvanov case where the evidence is concerned. The trial court judgment ordered the destruction of certain evidence (such as the articles of clothing and other objects with blood and sperm stains), and this means that the most crucial material evidence in the case will no longer be available.

Final judgments may still be contested in so-called supervision (*nadzor*) proceedings (arts.458–470 CCP). Supervision appeals may be filed by any party in the case. There is no time limit, but a supervision appeal which tends to worsen the position of the original defendant must be filed within six months after the judgment appealed against has become final. The grounds for filing a supervision appeal have been defined generously (art.459). The supervision appeal must be heard within a month of its having been received by the supervision court. In most cases the supervision court will be the Supreme Court of the Republic Kazakhstan; in some cases the supervision division of the provincial court will be competent. The supervision court has wide powers. The grounds for reversing earlier judgments are the same as in appellate proceedings.

**THE DEFENCE CASE**

As explained in the section on "Methodology", the defence case is fundamentally different from the prosecution case in two respects:
     the defence case need not be presented as a consistent narrative from the beginning of the investigation, but can be articulated gradually in the course of the trial, right up to the moment the defendant is given the opportunity to have the last word before the court retires to prepare its judgment (see art.365 CCP) ;
     the elements from which the defence case is constructed are not subject to the strict rules of evidence applicable to the evidence which constitutes the case for the prosecution; the evaluation of their credibility is left, in the preliminary investigation, to the investigator and the procurator, and in the trial phase, to the court.
The more detailed, consistent, and incontrovertible the defence version is, the more difficult it will be for the investigative, prosecuting and judicial agencies to disregard or reject it.
In the Duvanov case the defence version can be reconstructed on the basis of a considerable number of procedural statements and incidents. We shall attempt to reconstruct it in a chronological manner. We stress that it is the story as we understood it from written and oral communications of the defence side; we reserve our own judgment and insert our own observations in italics.

### The Story of the Defence

The status of Duvanov as one of the leading human rights activists in Kazakhstan is well known. Nobody would contest that his relations with the authorities have been strained for a long time, in fact already since the days of the Soviet Union. The latter point is not without relevance, because the senior positions within the government and law enforcement hierarchy are still almost completely occupied by old cadres.

*In our conversations with law enforcement personnel we were struck occasionally by proud references to long employment in this particular field.*

Duvanov was badly beaten up by unknown persons on 28 August 2002 and had to be hospitalized for several days. His publication of an article "The Silence of the Lambs", which contained a sharply-worded attack on the government and the President personally, may have constituted the final element which made unidentified persons within the government apparatus decide that the time had come to put an end to Duvanov's activity as a critic of the government. A plan was drawn up accordingly to involve him in a sexually charged situation, which would have the double effect of destroying his reputation as a champion of human rights, and of allowing his imprisonment for a considerable length of time. Already in the summer of 2002 Duvanov had been telling friends that he was afraid that one would set him up in some kind of sexual or drugs scandal, or that he would be the victim of an accident.

An important role in the execution of the plan seems to have been played by the police colonel E. Dzhakishev, who knew Duvanov's neighbour Cherkasov. The latter had a criminal record for drug offences and he used to work for Dzhakishev as a handyman.

*The latter two facts are not disputed.*

A suitable "victim" was found in Karaganda, in the daughter of Irina Sai, a woman had served time for robbery (a sentence of three years) before her daughter was born. Whether she served another sentence for hooliganism later on was contested. The daughter, although only 14 years old, looked much older and had probably been sexually active before.

*According to Kapeliushina's schoolmates, whose testimony had been video-recorded in Karaganda, she had been engaged in prostituion and had lived with a drugs dealer, Yakov Fyodorovich. There was some suggestion during the trial that Kapeliushina's sister was in fact her own child, but this matter was not further investigated.*

Whether Sai and Cherkasov had known each other previously could not be cleared up. In court they denied that this was the case, but persons who were not heard as witnesses asserted that Cherkasov and Sai's husband had served time together. In any case Cherkasov's wife was very suspicious about their relationship and even accused Cherkasov of being the father of Sai's second child.

Before going to Almaty in August 2002, Sai received some money. After arriving in Almaty she was given a mobile telephone (she claimed during the trial that she had bought it from an unknown person on the street); subsequently she gave the telephone to her daughter and received another one for herself (claiming again to have bought it from an unknown person in a department store).

*At the trial, Sai, who had been out of a job for quite a while, stated that she had received money for the sale of her apartment in Karaganda. There were, however, certain elements in her story which*

*were not satisfactorily explained. The same can be said about the origin of the comparatively expensive mobile telephones, and the reason for buying them. Sai and her daughter had stated repeatedly that they did not know anybody in Almaty and very few people in Karaganda, where they only had a few relatives living.*

They were picked up at the Almaty bus station by Cherkasov, who had been recruited beforehand by the organizers of the plot.

*At the trial, Cherkasov claimed to have acted out of kindness. Sai, however, stated that she had paid him.*

The unforeseen aversion of Cherkasov's wife against Sai upset the original plans, because Sai and her daughter were more or less thrown out by Cherkasova. They were then housed in a neighbouring village with a former policeman, Dyorin, who had served with Dzhakishev.

*Dyorin stated at the trial that unknown persons had come to him beforehand, asking him to take in Sai and her daughter, promising to pay for their stay.*

The stay with Dyorin was also not much of a success, as he became very unhappy with the behaviour of Sai and her daughter. That is why they moved again to Almaty after 2/3 weeks with Dyorin. Kapeliushina kept up contact with Cherkasov's stepdaughter Amina (Tanya), but Duvanov did not turn up during her visits. When he finally did turn up, at the weekend of 26/27 October, it was decided to put the plan into operation, especially since Duvanov was due to leave for the United States on 28 October.
After everybody had taken turns to go to the sauna, Kapeliushina and Amina (Tanya) stayed behind, talking to Duvanov and drinking wine or Fanta. While Duvanov had returned to the sauna, Amina (Tanya) was sent home by Kapeliushina.

*At the trial, a friend of Duvanov, Zlotnikov, stated that he had struck up a conversation with Tanya on 28 October in the Karasai police station, where a number of people has collected after the news of Duvanov's arrest had got around. Tanya told him that Kapeliushina had said to her, regarding Duvanov: "You do not know what I am going to do with him" and that Kapeliushina, pushing Tanya out of the room on the evening of 27 October, had said to her: "Your are still small, you don't have to see this." Tanya, however, was not questioned at the trial.*

When Duvanov returned to the room, he tried in vain to get rid of Kapeliushina, who offered to give him a massage. She pushed herself onto him and he pushed her away, saying that he was not interested in her advances. He turned around, drank a glass of wine and fell asleep in a chair. He did not remember anything, until he woke up alone and noticed that some of the buttons of the shorts he had been wearing were open.
Later on the same day the police came to Duvanov's dacha and took him to the Karasai police station. He was interrogated only the next day (29 October). Kapeliushina was interrogated on 28 October (this interview was videotaped) and also medically examined the same day. At some time during these two days it must have dawned on the investigating team that Kapeliushina's age might present a problem. She had been in the habit of giving her age as 18, and she also looked much older than her real age (14 years and 9 months). Duvanov would be on firm ground arguing that he did not know that she was any younger than she claimed to be. Accordingly, a story was concocted to the effect that Kapeliushina had handed him a piece of paper some time during the day on 27 October,

on which her age was given. Then a search was ordered of Duvanov's dacha, during which the paper was "found".

*As this search had also been video-recorded, we asked to be shown this recording during our second visit to Taldy-Kurgan. As soon as was possible, we wrote down our impressions of this viewing, which we shall reproduce here in full, in view of the importance which in our opinion could be attached to this episode.*
*"There are several short shots of police officials opening and closing cupboards. Then a uniformed policewoman begins to take books out of a bookcase and the camera stays with this part of the search. First the policewoman taking out the books is shown, then the camera swings to a woman official who is sitting on a couch right behind the policewoman who is taking out the books and who remainds partially (the lower half of her body) in view. The sitting official leaves through the pages of the books placed in front of her on the floor. Then the hand and part of the arm of the standing policewoman are seen, the hand holding a piece of paper. The policewoman, with her back still turned, drops the piece paper in front of the sitting official, who immediately picks it up and is seen beginning to read it.*
*The episode strongly suggests that the three persons involved (the two women and the person operating the camera) were aware beforehand of the significance of the paper. This would almost inevitably lead to the conclusion that the paper had been planted and prepared beforehand."*

The question of Kapeliushina's age and the connected episode with the note were, however, not more than an incident, although a major one, in the general course of the investigation. When the prosecution came up with evidence of sperm in the vagina, and succeeded in connecting the sperm with Duvanov through DNA-analysis (expert reports Nos.04-05/247 and 14682) a new procedural situation arose. Duvanov's spontaneous outburst at the trial: "How my sperm happened to get into the vagina of the victim once again confirms the provocation. How should I know how it got there?" may be understandable, but was procedurally inadequate. The defence adopted a two-pronged approach: they attacked the expert reports at the procedural level, claiming that they had been improperly drafted, that they did not meet the standards set by the law, but also that the results had been tampered with and falsified, etc.; they also, admitting implicitly that the reports were substantially correct, presented an alternative explanation for what had happened.

*Some doubt remains whether the reports were in all respects irreproachable in view of the strict requirements imposed by the CCP. Moreover, it remains questionable whether the court was at liberty to discard the Russian expert reports as evidence, since the CCP (art.115) mentions not only expert reports [produced in the prescribed manner], but also "other documents" as possible sources of evidence, and the Russian reports would of course be covered by such a formula.*

*The alternative explanation for what happened in Duvanov's dacha, late in the evening when only he and Kapeliushina were there, has not been made very forcefully by the defence, but only tentatively, and in bits and pieces. It comes down to the following, as we understand it.*

While Duvanov was in the sauna for the last time and Kapeliushina was alone in the room, she put some kind of drug in a glass of wine. After Duvanov had passed out, she opened Duvanov's shorts and manually effected an erection. She then either continued until an ejaculation occurred, catching some of the sperm on some piece of textile, or she inserted his penis into her vagina and continued stimulation until an ejaculation occurred.

*At the trial there was some discussion with the experts concerning report No.109, in which it had been stated that " normal sexual intercourse with a female partner without the consent of the male partner is improbable, and, if the latter is in deep sleep, impossible". The experts admitted that the question had been formulated incorrectly and that masturbation effected on an unconscious male should not be considered normal intercourse.*

The fact that no traces of sleep-inducing drugs were found could be explained either by the fact that the experts had not looked for the right substances, or, more likely, that they had investigated only two glasses and not the third glass, the one from which Duvanov had been drinking. Also, a towel which Duvanov had used to mop up some wine he had spilled from his glass had not been examined, although the defence had asked for this.

The existence of a conspiracy to incriminate Duvanov has further been suggested by the press conference given by police officer M. Urumkhanov on the evening of 28 October 2002. At this press conference a briefing paper about the Duvanov case turned up which had been sent from the fax machine of the presidential administration in Astana the same morning.

Beyond the points mentioned above, there are still numerous others which each individually punch holes in the prosecution case, as they have not been explained in a manner which would leave the consistency of the prosecution case intact. Among such points one could mention:
the lock on the inside door of Duvanov's dacha, which had been decommissioned a long time ago, although Kapeliushina claims that Duvanov locked her in before raping her;
several statements that assert that Kapeliushina was not at all upset after the alleged rape;
the inconsistency of Kapeliushina's statements about the position of her knickers; first she indicated that Duvanov had pushed them down to her knees, but when it was put to her that rape would actually be physiologically impossible in that situation, she changed her statement to the effect that Duvanov had pulled them off altogether
the first statement by Kapeliushina's mother, I. Sai, made at the Karasai police station and reporting the rape of her daughter has been questioned by the defence; the legal literacy of the statement suggests that it was dictated to Sai; the date on it has been written in another hand;
the story that Cherkasov had received a long sentence for drugs offences in 2000, but had inexplicably been released;
the conflicting statements about Kapeliushina's handbag; she was supposed to have written the notorious note on a sheet of paper taken from a writing-pad which she kept in her handbag; the size of the sheet indicated, however, that such a writing-pad could not possibly have fitted in her bag.

## CONCLUSIONS

As we indicated at the beginning of this report, the essence of a criminal trial is the construction of a story. In order to result in a conviction, the contents of the story must be that a crime has been committed, and the story must contain the evidence required to prove that the story is true. Moreover, the telling of the story is subject to a great number of formal requirements. In the end the listener, the judge, must decide that the story has been told in the prescribed manner and that he is now convinced that the story is true.

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

Outsiders may put themselves in the place of the judge and try to decide, vicariously, whether they believe that the story has been told in the prescribed manner and whether they find it convincing.

In most cases, however, there is a complicating factor, because the defence may produce a conflicting story concerning the same factual events. The prosecution then still has to prove its case in the required fashion, but, additionally, it has to rebut at every stage the defence version of what actually happened. And if the defence story also implies that the prosecution story is in bad faith, that it is (at least in part) a fabrication, the prosecution's task is even more difficult, because everything it says or does -- and even more so, everything it does not do -- may be constructed by the defence as part of the prosecution's plot. But there are also high costs on the defence's side: theirs is an all-or-nothing strategy; if the conspiracy theory does not hold up, the entire defence case collapses.

The prosecution case against Duvanov was straightforward: there was Kapeliushina's allegation that she had been raped by him; expert opinion confirmed the presence of Duvanov's sperm in Kapeliushina's vagina, and the presence of bruising, indicating some form of violence. Additionally, there was Cherkasov's statement that Duvanov had confessed his guilt to him by means of a gesture. (The remainder of the evidence is circumstantial.)

**Our provisional judgment on the prosecution case has been that it is not of sufficient strength to warrant a conviction:**

> Kapeliushina is demonstrably unreliable;
> the presence of sperm in the vagina only suggests sexual intercourse, not necessarily rape;
> the insignificant bruising of the victim is inconsistent with rape;
> Cherkasov's statement about his gesture hardly qualifies as serious evidence, even if Cherkasov could be considered a reliable witness.

Then there is the defence version: Duvanov has been the victim of an elaborate plot, to remove him, as a person who proved to be a thorn in the side of certain government officials and agencies, from the public arena, both physically — by locking him up for a considerable period — and by permanently destroying his public image – by parading him as a rapist and child molester.

The defence story is obviously not subject to the strict rules of evidence that govern the case for the prosecution. If the defence succeeds in telling a story that is internally consistent, possesses a certain degree of credibility, and has not been convincingly refuted by the prosecution, the prosecution's story will have to be weighed against it and the judge might easily reach the conclusion that the prosecution, even if they have a good story, has not succeeded in dispelling all doubt about its truthfulness.

**In this matter it is our provisional conclusion that this is indeed the case.**

If the defence version were true, it would imply that persons within the government and law enforcement apparatus would have been guilty themselves of criminal acts. They cannot be expected to co-operate with the defence's efforts to unearth the truth. Honest officials should therefore do everything in their power to investigate the defence's allegations; for reasons of principle: because it is their duty under the CCP to investigate criminal cases fully and objectively, and for pragmatic reasons: otherwise their inactivity or lack of zeal may make themselves look suspect.

If the defence version were untrue, the officials have nothing to hide and they have every interest in energetically investigating and rebutting the false allegations of the defence.

It is perhaps sufficient in this matter to point to the more than 100 complaints about the investigation and requests further investigation, made by the defence during the preliminary investigation, of which the majority were rejected by the investigator, the procurator or the court, to establish that the

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

law enforcement officials and authorities in the Duvanov case have not succeeded in demonstrating that they were totally committed to the revelation of the true course of events.

In this respect a final observation must be made. The fundamental duty to take all necessary steps to guarantee an "all-sided, full and objective examination of the circumstances necessary and adequate for a correct resolution of the case", a duty which art.24 CCP imposes on judges, procurators, investigators and police officers alike, would certainly require that a serious effort should have been made to establish what actually happened on the evening of 27 October 2002 in Duvanov's dacha.

We have argued that the evidence for the case of the prosecution is defective and also that it leaves too many points brought forward by the defence unexplained. On the other hand, the defence's story contains two major elements which still lack serious corroboration: the drugging of Duvanov, for which no real indication has been found, and the explanation of the presence of Duvanov's sperm in the vagina of Kapeliushina, if one accepts that Duvanov was unconscious at the time.

Most of these problems can be cleared up by the hypothesis that there was consensual sexual intercourse between Duvanov and Kapeliushina. This would explain the absence of injuries and the presence of the sperm. Duvanov's and Kapeliushina's stories about the course of events during the evening coincide to a great extent; they had all been working in the house during the day; then they all had taken turns in going to the sauna; they were having a drink and all the others had left; both of them were only half dressed; it is only from the moment of the massage (who initiated it?) that the stories begin to diverge.

When we asked the procurators and investigators during our second visit to Taldy-Kurgan why they had not investigated the possibility of consensual intercourse, they replied that nobody had asked for that: Kapeliushina said she had been raped, and Duvanov said that nothing had happened, as far as he could remember.

If the consensual intercourse hypothesis is combined with the versions advanced by the two sides, a more complicated set of possibilities emerges.

a) The "official" version: Duvanov raped Kapeliushina; there was no plot; the only controversial point that remains is whether Duvanov was aware of the fact that Kapeliushina was a minor.

b) The defence version: Duvanov was set up, drugged, and Kapeliushina extracted his sperm in some way.

c) Consensual sex, no plot: Kapeliushina, perhaps afraid of what her mother would say, claimed afterwards that she had been raped; Duvanov, mindful of his reputation and considering that it would be his word against hers, denied everything and, when the expert evidence became available, claimed that he had been drugged.

d) Consensual sex as the result of a set-up to discredit Duvanov: Kapeliushina's rape claim may have been part of the plot from the beginning, or the plotters may have decided that it would be good thing to throw in after the event; Duvanov, realizing too late that he had been trapped and that an admission would harm his reputation, decided to attempt to save the situation by advancing the theory that he had been drugged, a big risk, but the best course to save his reputation: if he lost he would still be a martyr.

Leiden, 28 March 2003

Ferdinand J.M. Feldbrugge                                William B. Simons

Exhibit B

RECYCLED



BMB MUNAI, INC. (OTC BB: BMBM.OB) | Last Trade: **6.37** | Change: ⬇ -0.03 (-0.47%)

English Русский

Company Information
Operations
Investor Relations
Press Center
Contact Us

To view the March 22, 2006 Letter to Shareholders from Boris Cherdabayev, BMB Munai, Inc. Chairman of the Board, please click here.

**BMB Munai, Inc. (BMB)** is an independent oil and gas company engaged in the exploration, development and production of crude oil and natural gas. The Company's operations are primarily focused onshore in proven oil and gas producing territories of Caspian Sea region of the Republic of Kazakhstan.

We conduct our operations in Kazakhstan through a 100%-owned subsidiary, Emir Oil, LLC ("Emir Oil"), a company, organized under the laws of Kazakhstan.
Our goal is to take advantage of rapidly developing Oil & Gas industry in Kazakhstan, achieve low-cost production, and become a major Oil & Gas producer in Central Asia.
Directors and Executives of BMB Munai are prominent individuals in Kazakhstan and FSU with extensive experience in Oil & Gas industry and Finance. The Company is well positioned to access additional oil and gas properties, attractive debt financing, favorably priced drilling and well services, and to build up strong local exploration and production staff.

BMB Munai, Inc. is a public corporation with shares traded on the over the counter bulletin board ("OTCBB") under the trading symbol BMBM.

**Today's BMB Munai**

- July 5, 2006 - BMB Munai, Inc. Re-Enters Well in Borly Field »
- June 29, 2006 - BMB Munai, Inc. files annual report on Form 10-KSB with the SEC. »
- BMB Munai, Inc. files Current Report on Form 8-K regarding option and restricted stock grants, amended bylaws and amended articles of incorporation. »
- June 26, 2006 - SEC posts Notice of Effectiveness for BMB Munai, Inc. registration statement on Form SB-2. »
- June 16, 2006 - BMB Munai, Inc. files an amended registration statement with SEC on Form SB-2/A »
- BMB Munai, Inc. announces the appointment of President and Vice President. »
- BMB Munai, Inc. Announces Gas Utilization Project Commencement. »

Copyright © 2004—2006 BMB Munai, Inc.
Use of this Web site constitutes acceptance of the BMB Munai User Agreement

Company Info | Site Map | Contact Us

BMB Munai - Boris Cherdabayev

 English Русский

Home / Company Information / Officers and Directors / Boris ...ev



**Home**
**Company Information**
   Company History
   BMB Munai Code of Ethics
   Subsidiaries
   Officers and Directors
   Career
   Maps and Pictures Gallery
**Operations**
**Investor Relations**
**Press Center**
**Contact Us**

**Mr. Boris Cherdabayev**, 50, Chairman of the Board & Chief Executive Officer.

Mr. Cherdabaev is a prominent figure in the Kazakhstan Energy Sector with 30 years experience in the International Petroleum industry. Originated from an "oil family" he went during his career through all corners, basements and roofs of the oil industry from a hands-on experience at the rig and producing well to the highest level of management at leading oil production companies.

Mr. Cherdabaev began his career as an oil and gas field production operator in 1970 right after a high school graduation. He used to work for 2 years at Production Association "Mangyshlakneft", NPU "Uzen" (later NGDU "Uzen'neft").

Mr. Cherdebayev holds engineering degrees from the Ufa Oil & Gas Institute and Kazakhstan Polytechnic Institute. In 1971 he began his higher education at Oil & Gas Institute of Ufa (Bashkorstan, FSU), which he graduated in 1976 with a specialization in "machinery and equipment of oil and gas fields". Later he graduated from the Kazakh Polytechnic Institute with a specialty "mining engineer on oil and gas fields development". During his career he also completed an English language program in the US, CHAMP Program (Chevron Advanced Management Program) at Chevron Corporation offices in San-Francisco, CA, USA, and CSEP Program (Columbia Senior Executive Program) at Columbia University, New York, NY USA.

From 1976 till 1980 he worked at Production Association "Embaneft", Department of Exploration Drilling, first as motor-mechanic, then machinist, senior mechanic and

BMB Munai - Boris Cherdabayev

master mechanic.

1981 - 1988 were years of a political and government career for Mr. Cherdabaev. First, till 1986, at Novouzen City Committee of Party and Novouzen City Executive Committee as instructor, head of technical and transport department and first deputy chairman of the City Executive Committee. Since 1986 till 1988 Mr. Cherdabaev served at Mangyshlak Regional Executive Committee as a head of Planning and Economy Department.

In 1989-1990 Mr. Chedabayev served as deputy manager of Production and Technological Department at the Production Association "Mangyshlakneft", NGDU "Zhetybaineft", one of the leading state oil companies in Kazakhstan .

In 1991 he has been appointed as a General Director of the Scientific and Production Co-operative Association "Kazpromstroy", where he worked till 1992.

Since 1992 till 1993 Mr. Cherdabaev used to be a Head of Project in "Karakudukmunay" Project for developing a prospective oil field at Karakuduk.

From 1994 to 1995 Mr. Cherdabayev served as Deputy General Director at the state owned Oil Production Association "Mangyshlakneft".

In 1995 he moved to JSC "Mangistaumunaygas", a leading oil and gas production company in Kazakhstan . Till 1997 he served at the company as Vice-President and a Member of the Board of Directors.

In 1997 - 1998 Mr. Cherdabayev has been at a training program in the US : ISLS, Berlits School , University of George Washington, USA, Washington.

In 1998 Mr. Cherdabayev has been offered a position at NOC "Kazakhoil", a ROK number one oil and gas

BMB Munai - Boris Cherdabayev

exploration and production company. He used to serve at "Kazakhoil" till 1990 as a Member of the Board of Directors, Vice-President on Exploration and Production and Executive Director on Services Projects Development. At the same period of time he used to have other positions as a Chairman of the Board of Directors of OJSC "Uzenmunaygas", a Chairman of the Board of Directors of OJSC "Kazakhoil-Emba", a Chairman of the Board of Directors of OJSC "Kazakhstancaspiyshelf", and a Member of Joint Committee on Karachaganak Project Management, all leading oil and gas production companies in Kazakhstan.

In May 2000 Mr. Cherdabayev, as a prominent figure in oil and gas industry of the ROK has been offered a position of a Director at LLP "Tengizchevroil" (Chevron -50%, ExxonMobil - 25%, KazMunayGaz - 20%, LukOil - 5%). He used to serve at that position till May 2003 when he joint BMB Holding, Inc. team as a founder and a Chairman of the Board of Directors. With his outstanding experience in oil and gas industry he will also manage all filed operations at ADE through Emir Oil, LLC.

Mr. Cherdabayev always has been a socially active person. Since 1983 till 1988 he used to serve as a people representative at Novouzen City Council ( Kazakhstan ) and in 1994 - 1998, as a people representative at Mangistau Oblast Maslikhat (regional level legislative structure) and a Chairman of the Committee on Law and Order. For his achievements Mr. Cherdabayev has been awarded with a national "Kurmet" order.

Copyright © 2004–2006 BMB Munai, Inc.
Use of this Web site constitutes acceptance of the BMB Munai User Agreement

Home | Company Info | Site Map | Contact Us

BMB Munai - Valeriy Tolkachev

 English  Русский



**Home**
**Company Information**
    Company History
    BMB Munai Code of Ethics
    Subsidiaries
    Officers and Directors
    Career
    Maps and Pictures Gallery
**Operations**
**Investor Relations**
**Press Center**
**Contact Us**

**Mr. Valery Tolkachev,
Director.**

Since 1999, Mr. Tolkachev serves for Aton Investment Company in Moscow, Russia. Currently - Director, Capital Markets Department. From 1991 to 1999, Mr. Tolkachev served in various managing positions (including Treasury) at MDM Bank, Inkombank, Inkom Capital, Tveruniversalbank. In early 90s he also held a position of a Director at TIRAbrok Company, a commodity house in Moscow. Mr. Tolkachev graduated with Honors from the High Military School in Kiev, USSR in 1989. He is currently graduating from the Academy of National Economy, Moscow Law faculty.

Copyright © 2004–2006 BMB Munai, Inc.
Use of this Web site constitutes acceptance of the BMB Munai User Agreement

Home | Company Info | Site Map | Contact Us

BMB Munai - Georges Benarroch

 English Русский

Home / Company Information / Officers and Directors / Georg...ch 

## Home
## Company Information
   Company History
   BMB Munai Code of Ethics
   Subsidiaries
   Officers and Directors
   Career
   Maps and Pictures Gallery
## Operations
## Investor Relations
## Press Center
## Contact Us

**Georges Benarroch, 56. Director.**

An investment banker trained in France, the USA and Canada . A graduate from the Faculte de Droit in Toulouse (France), obtained a B.Sc. from the Universite de Montreal (Canada) followed by a M.Sc. International Relations and Economic Development from both the Faculte de Droit de Nice (France) and the Institut des Hautes Etudes Internationales, completed by a Doctorat de Droit (III cycle) at the Universite de Paris (France).

Since 1982, member of the Investment Dealer Association of Canada as the President and CEO of Euro Canadian Securities Limited and its successor company, Credifinance Securities Limited, an institutional investment bank, based in Toronto , a member of the Toronto Stock Exchange and the Montreal Exchange. Credifinance Securities Limited has been one of the North American pioneers in providing investment banking and equity research coverage of companies in the FSU.

Since 1994, Credifinance Securities Limited has acted as agent and/or underwriter, stock exchange sponsor, and introducing broker for a number of companies operating in the FSU and was instrumental in supporting Hurricane Hydrocarbons (now PetroKazakhstan) and Transmeridian Exploration through its early stage of development. Mr. Benarroch is also President and CEO of Credifinance Capital Inc. based in Toronto , Canada and Credifinance Capital Corp. based in Palm Beach , Florida , both companies specialized in proprietary trading, private equity funding and venture capital. Also, since 1994, President and CEO of InterUnion Financial Corporation, a "business bank", which created in 1996 InterUnion Asset Management, a

BMB Munai - Georges Benarroch

Canadian money management firm with over $1.5 billion under management subsequently sold in 2001. Besides his business interests, Mr. Benarroch dedicates time to charity or academia oriented foundations and international issues through the Academie de la Paix as well as lectures he gives at the Institut des Hautes Etudes Internationales.

Copyright © 2004–2006 BMB Munai, Inc.
Use of this Web site constitutes acceptance of the BMB Munai User Agreement

Home | Company Info | Site Map | Contact Us

Message

## Rie, Linda J. (x2896)

**From:** Horton, Scott (x2820)
**Sent:** Wednesday, July 12, 2006 5:30 PM
**To:** Rie, Linda J. (x2896)
**Subject:** FW: Sokol v. BMB

Note person to whom it goes below

Scott Horton
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Tel:    +1 212 336 2820
Fax:    +1 212 336 2246
Mobile: +1 917 216 2319
email: shorton@pbwt.com

-----Original Message-----
**From:** Jacob Goldberg [mailto:jacobagoldberg@comcast.net]
**Sent:** Wednesday, July 12, 2006 9:24 AM
**To:** Horton, Scott (x2820)
**Cc:** 'Jonathan Auerbach'; 'Tamara Bock'
**Subject:** Sokol v. BMB

Scott: I have reviewed your Decl and I have not comments. Thank you for the effort.

Upon receiving the check, please execute the declaration, pdf it and email it to me. Please also deliver the
original, no later than tomorrow morning to

Tamara L. Bock
Dewey Pegno & Kramarsky LLP
220 East 42nd Street
New York, NY 10017
Voice:  212 943 9000

Thanks again.

Best,
jag

Jacob A. Goldberg, Esq.
FARUQI & FARUQI, LLP
P.O. Box 30132
Elkins Park, PA  19027
Tel: (215) 782-8235
Fax: (215) 782-8236

320 East 39th Street
New York, NY  10016
Tel: (212) 983-9330

Message

PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND/OR WORK PRODUCT.  The information in this transmittal, including any attachments thereto, may be privileged and/or confidential.  It is intended only for the recipient(s) listed above.  If you are neither the intended recipient(s) nor a person responsible for delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution or copying of this transmittal is prohibited.  If you have received this transmittal in error, please notify Jacob A. Goldberg, Esq. LLC immediately at (215) 782-8235 or by return email.