UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOKOL HOLDINGS, INC., BRIAN SAVAGE and
THOMAS SINCLAIR

       Plaintiffs,

- against -

BMB MUNAI, INC., ALEXANDRE AGAIAN,
BAKHYTBEK BAISEITOV, GEORGES
BENARROCH, BORIS CHERDABAYEV,
MIRGALI KUNAYEV, CREDIFINANCE CAPITAL,
INC. and CREDIFINANCE SECURITIES, LTD.

       Defendants.

05 CV 3749 (KMW)

**DECLARATION OF
KENNETH A. CARUSO
IN SUPPORT OF MOTION
FOR STAY PENDING APPEAL**

KENNETH A. CARUSO declares, under penalty of perjury:

 1. I am a member of the Bar of this Court and a partner in the firm of Bracewell & Giuliani LLP, counsel for defendants in this action. I submit this declaration in support of defendants' motion for a stay pending appeal.

A. The Parties

 2. Plaintiff Sokol Holdings, Inc. ("Sokol") is a Delaware corporation with its principal place of business in Colorado. Second Amended Complaint ¶ 10.[1] (A true and correct copy of the Second Amended Complaint ("SAC"), dated November 14, 2005, including the exhibits annexed thereto, is attached as Exhibit 1.)

 3. Plaintiff Brian Savage, a resident of Colorado (SAC ¶ 11), and plaintiff Thomas Sinclair, a citizen of New Zealand who holds a dual European Union passport issued by the United Kingdom (SAC ¶ 12), were, and remain, Sokol's directors and principal officers. SAC ¶¶ 11-12.

---

[1] Many of the statements in this declaration are taken from plaintiffs' Second Amended Complaint, and defendants and I accept them solely for the purpose of this motion.

4.      Defendant BMB Munai, Inc. ("BMB"), a publicly-traded company, is a Nevada corporation with its principal place of business in the Republic of Kazakhstan and an office in Salt Lake City, Utah. SAC ¶ 22. Defendants Baiseitov, Cherdabayev and Kunayev are residents of Kazakhstan. SAC ¶¶ 25(b), 25(d), 25(e). Defendant Agaian is a citizen of Russia and a resident of New York. Defendant Benarroch is a citizen of France and Canada. Defendants Credifinance Capital, Inc. and Credifinance Securities, Ltd. are corporations located in Ontario. SAC ¶¶ 23, 24.

B.      <u>The Republic Of Kazakhstan</u>

5.      Kazakhstan is a constitutional republic in Central Asia, bordering Russia, China, Uzbekistan, Kyrgyzstan and Turkmenistan. Kazakhstan is the ninth-largest country in the world (1.56 million square miles, about the size of Western Europe) and the second most-populated country in Central Asia (approximately 14.8 million people). The state language is Kazakh, while the official language is Russian. See U.S. Department of State, Background Note: Kazakhstan (April, 2005), a true and correct copy of which is attached as Exhibit 2.

6.      Kazakhstan and the United States maintain close relations. In fact, "[t]he United States was the first country to recognize Kazakhstan, on December 25, 1991, and opened its Embassy in Almaty in January 1992. In the years since Kazakhstan's independence, the two countries have developed a wide-ranging bilateral relationship." <u>Id</u>.

C.      <u>The Relevant Contracts And Transactions</u>

7.      Sokol was formed for "the purpose of exploring and developing oil and gas fields in the Republic of Kazakhstan." SAC ¶ 10. Plaintiffs allege that Sinclair and Savage prepared a "business plan" for developing oil fields in Kazakhstan, and that they distributed the business plan to the individuals named as defendants in this action. <u>Id</u>. ¶ 2. Plaintiffs further allege that

several of the individual defendants agreed to serve as members of Sokol's board of directors. Id. ¶ 32.

8. On April 26, 2003, Sokol and a man named Tolmakov Toleush Kalmukanovitch ("Tolmakov") executed a contract (the "Emir Contract") for the sale of stock of a company called Emir Oil LLP ("Emir"). SAC ¶ 4. Tolmakov is a citizen of Kazakhstan. Emir Contract at 2; Caruso Decl. Ex. 1-D. Emir is a company organized under the laws of Kazakhstan. Id. at 3. The Emir Contract was executed in Kazakhstan. Id. at 21. Emir held a license, granted by the government of Kazakhstan, to explore the Aksaz-Dolinnaya-Emir ("ADE") oil and gas fields in Kazakhstan. In the Emir Contract, Tolmakov agreed to sell a controlling interest in Emir to Sokol.

9. The Emir Contract required arbitration of disputes in Kazakhstan:

> 7.1 The Parties shall resolve all disputes and disagreements arising from this Agreement through negotiations.
>
> 7.2 Should the disputable issue be unsolved through negotiations within 30 days upon its arousal [sic], the Parties shall transfer the disputable issue for its resolution at the International Arbitration Court of the Republic of Kazakhstan, to one or several arbitrators according to the regulations.

10. The Emir Contract required Sokol to pay $700,000 to Emir the day after the signing of the contract to finance the exploration of the oil fields. Id. ¶ 2.4.2. The Emir Contract also required Sokol to pay an additional amount for the shares within three days of the signing. Emir Contract ¶ 4.2.

11. Sokol failed to make these payments, allegedly because of defendants' "interference." SAC ¶¶ 48-54. The Emir Contract was to terminate 10 days after signing if the parties had not approved or signed a new Charter and Foundation Agreement. Emir Contract ¶ 8.5. The parties did not approve or sign such documents.

12. Thereafter, Tolmakov sold the shares of Emir to BMB. Later, BMB purchased the remainder of Emir. SAC ¶ 69. Tolmakov remains the general manager of Emir.

D. Sokol Goes Forum-Shopping

13. Sokol failed to invoke the dispute resolution provisions of the Emir Contract. Thus, Sokol never commenced an arbitration against Tolmakov -- who supposedly breached the Emir Contract -- or anyone else.

14. Instead, in December 2003, Sokol, Sinclair and Savage commenced an action in a Florida state court against five defendants, who are also named as defendants in this action. The Florida complaint alleged that the defendants misused the "business plan" prepared by Sinclair and Savage. The Florida complaint, however, did not even mention the Emir Contract.

15. On April 12, 2005, Sokol commenced this diversity action -- its second action arising from this dispute. In its Complaint, Sokol alleged that Cherdabayev, Baiseitov, Kunayev and Agaian caused and induced Tolmakov to breach the Emir Contract and to "sell 70% of Emir to BMB" instead of Sokol. See Complaint, dated April 6, 2005, at ¶ 26. (A true and correct copy of the initial complaint in this action, dated April 6, 2005, is attached as Exhibit 3.) Accordingly, Sokol alleged that it "has been deprived of its contractual interest in Emir and its underlying interest in the ADE fields." Id. ¶ 28. Sokol sought money damages for tortious interference with contract and "specific performance" of the Emir Contract.

E. Plaintiffs File Two Amended Complaints

16. Plaintiffs agreed to dismiss the Florida action without prejudice. Defendants moved to stay or dismiss this action pending arbitration. Rather than oppose the motion, plaintiffs filed an amended complaint, which (a) added Sinclair and Savage as plaintiffs, (b) added several defendants and (c) added various claims. Specifically, the amended complaint alleged four groups of claims: (a) the original claims for tortious interference with the Emir

Contract and for specific performance of the Emir Contract; (b) additional tort claims allegedly arising from defendants' misappropriation of the business plan and the transaction memorialized in the Emir Contract; (c) claims that certain defendants breached fiduciary duties that they allegedly owed as investment bankers; and (d) claims that certain defendants breached fiduciary duties that they allegedly owed as "constructive[] directors" of Sokol.

17. The amended complaint, however, destroyed this Court's subject matter jurisdiction because some of its claims pitted citizens and aliens as plaintiffs against aliens as defendants. When defense counsel noted this jurisdictional defect, plaintiffs filed, on or about November 14, 2005, yet another pleading, the SAC, which cured the defects of subject matter jurisdiction and which averred substantially the same four groups of claims identified above.

F. Defendants Move To Stay Or Dismiss This Action; Plaintiffs Seek Full-Blown, Merits Discovery

18. On November 30, 2005, defendants moved again to stay or dismiss this action. As relevant here, defendants argued:

> (a) The action should be stayed under section 3 of the Federal Arbitration Act, 9 U.S.C. § 3, pending arbitration in Kazakhstan.
>
> (b) The Court should dismiss on the ground of forum non conveniens in favor of litigation in a court in Kazakhstan.
>
> (c) The Court should dismiss in favor of litigation in a New York state court.

19. Additionally, the three individual defendants who are residents of Kazakhstan and the three defendants located in Canada moved to dismiss for lack of personal jurisdiction.

20. Finally, defendants moved to dismiss on the ground that Tolmakov was an indispensable party and moved to dismiss certain counts for failure to state a claim upon which relief can be granted.

21.     Meanwhile, on or about November 16, 2005, two days after plaintiffs filed the SAC, plaintiffs served a broad document demand, which sought voluminous, merits-based discovery. (A true and correct copy of Plaintiffs' First Request for the Production of Documents, dated November 16, 2005, is attached as Exhibit 4.)

22.     Defendants resisted plaintiffs' effort to obtain such discovery. After extensive discussions among counsel and after proceedings before Magistrate Judge Freeman, defendants offered to produce documents that plaintiffs might reasonably claim to need to respond to the motion to stay or dismiss. Plaintiffs, however, continued to insist on full-blown discovery. On February 1, 2006, Judge Freeman agreed in full with defendants' position concerning the documents:

> At this stage, defendants proposed compromises on the discovery sought by plaintiff appear reasonable. Defendants should proceed to make its production of documents on an expedited schedule to be agreed by the parties.

(A true and correct copy of defendants' January 25, 2006 letter to Judge Freeman, which Judge Freeman "Memo Endorsed" on February 1, 2006, is attached as Exhibit 5.)

23.     Counsel for defendants then obtained and reviewed documents from defendants in three countries. In May 2006, defendants completed their document production, having produced approximately 9,000 pages of documents. On June 12, 2006, defendants renewed their motion to stay or dismiss. (A true and correct copy of defendants' notice of motion is attached as Exhibit 6.) The motion was fully briefed and submitted to the Court for decision on August 24, 2006.

24.     On or about February 27, 2007, Judge Freeman entered a scheduling order, requiring fact discovery to be completed by August 24, 2007, and expert discovery to be completed by October 26, 2007. (A true and correct copy of the Scheduling Order is attached as

Exhibit 7.) Thereafter, defendants moved for a stay of discovery pending resolution of the motion to stay or dismiss. (True and correct copies of (i) a letter, dated March 23, 2007, from defendants to Judge Wood; (ii) a letter, dated March 23, 2007, from defendants to Judge Freeman and (iii) a Notice of Cross-Motion, dated April 13, 2007, are attached as Exhibit 8.)

G.  The Court Denies Defendants' Motion;
    Plaintiffs Press For Discovery

25. On June 14, 2007, this Court issued an Opinion and Order dismissing certain claims but otherwise denying defendants' motion to stay or dismiss. (A true and correct copy of the Opinion and Order, dated June 14, 2007, is attached as Exhibit 9.) In particular, the Court denied defendants' motion to stay this action pending arbitration pursuant to 9 U.S.C. § 3. The Court also denied, as moot, defendants' motion for a stay of discovery.

26. Plaintiffs have now renewed their discovery efforts. They have noticed five depositions, and have sought yet another conference before Judge Freeman. (True and correct copies of plaintiffs' five deposition notices are attached as Exhibit 10; a true and correct copy of plaintiff's letter to Judge Freeman, dated June 27, 2007, is attached as Exhibit 11.) The requested document production again requires the collection and review of documents from defendants in three countries. The requested discovery will also require substantial expenditures of time to prepare for the deposition of each defendant. The discovery process will likely require extensive travel to and from Kazakhstan and other places.

H.  Defendants Appeal And Move For A Stay

27. On July 2, 2007, defendants filed a Notice of Appeal, pursuant to 9 U.S.C. § 16(a)(1)(A), from that portion of the Opinion and Order refusing to issue a stay pending arbitration under 9 U.S.C. § 3. (A true and correct copy of plaintiffs' Notice of Appeal, dated

July 2, 2007, is attached as Exhibit 12.) Defendants now move for a stay of all proceedings, including discovery and trial, pending disposition of their appeal.

28. Absent a stay, defendants will have to serve document demands of their own and to notice depositions of plaintiffs. The parties may also seek documents and testimony from non-party witnesses located in the United States and in foreign countries, such as Kazakhstan and Canada. Expert discovery will follow. And, there are sure to be -- indeed, there already are -- additional discovery disputes that will require judicial time and resources.

29. In short, discovery here will be time-consuming, complicated and expensive; so will the trial.

30. Pursuant to Local Rule 6.1(d), and as shown above and in the accompanying memorandum of law, defendants seek a stay pending appeal of that portion of the Opinion and Order in this action that refused to issue a stay pending arbitration under 9 U.S.C. § 3. The reasons justifying the grant of a stay pending appeal, as discussed above, also demonstrate why defendants move by order to show cause, rather than by notice of motion, to obtain the requested relief. Defendants respectfully submit that the very purpose for requesting a stay pending appeal -- i.e., to avoid time-consuming, complicated and expensive discovery and motion practice -- would be undermined by proceeding under the less efficient notice-of-motion procedure. Defendants, moreover, are daily being inflicted with costs and burdens associated with discovery. These will continue until and unless a stay is granted. Thus, time is of the essence in order to stop unnecessary expense and burden. Accordingly, defendants have proceeded by order to show cause.

31. Defendants have not filed a previous application for similar relief.

I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on July 2, 2007

_____
KENNETH A. CARUSO