UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
SOKOL HOLDINGS, INC., et al.,
                                                            :
                                        Plaintiffs,              05 Civ. 3749 (KMW) (DF)
                                                            :
                        -against-                                **MEMORANDUM AND**
                                                            :    **OPINION**
BMB MUNAI, INC., et al.,
                                                            :
                                        Defendants.
------------------------------------------------------------X

**DEBRA FREEMAN, United States Magistrate Judge:**

<u>INTRODUCTION</u>

        The plaintiffs, Sokol Holdings, Inc. ("Sokol"), Brian Savage ("Savage"), and Thomas

Sinclair ("Sinclair") (collectively, "Plaintiffs"), bring this action against Alexandre Agaian

("Agaian"), Bakhytbek Baiseitov ("Baiseitov"), Georges Benarroch ("Benarroch"), Boris

Cherdabayev ("Cherdabayev"), Mirgali Kunayev ("Kunayev") (collectively, the "Individual

Defendants"), as well as BMB Munai, Inc. ("BMB"), Credifinance Capital, Inc., ("CCI"), and

Credifinance Securities, Ltd. ("CSL") (all defendants collectively referred to as "Defendants").

Plaintiffs filed their initial Complaint in this matter on April 12, 2005 (Dkt. 1), and have since

amended it twice; once on October 12, 2005 (Dkt. 13), and again on November 15, 2005

(Dkt. 18).  Presently before the Court is Plaintiffs' motion to amend their pleading once again.

(Dkt. 75.)  The proposed Third Amended Complaint adds certain factual allegations, excises

Plaintiffs' claim for specific performance, recasts various other claims that were previously

alleged, and adds claims for fraud and promissory estoppel.  (*See generally* Proposed Third

Amended Complaint, dated Dec. 12, 2008 ("3d Am. Compl.").)  For the reasons discussed

below, Plaintiffs' motion for leave to file the Third Amended Complaint is granted in part and

denied in part.

## BACKGROUND

### A.      Factual Background

#### 1.      The Formation of Sokol

According to the Second Amended Complaint, Plaintiffs' operative pleading in this

matter, in early 2003, Savage and Sinclair drafted a business plan (hereinafter, the "Sokol

Business Plan"), outlining, in detail, a proposed business venture.  (Second Amended Complaint,

dated Nov. 14, 2005 ("2d Am. Compl."), at ¶¶ 1, 26.)  The plan was to develop an oil and gas

exploration and production company in the Republic of Kazakhstan.  (*Id*., at ¶ 26.)  Pursuant to

the Sokol Business Plan, Savage and Sinclair would first acquire the right to search for and

produce oil and gas in a specified location in Kazakstan, known as the Aksaz-Dolinnaya-Emir

oil and gas field (the "ADE Fields").  (*Id*., ¶¶ 4, 26.)  They would then place the exploration and

production rights in Sokol, an American corporation they intended to form.  (*Id*., at ¶¶ 1, 26.)

Thereafter, Savage and Sinclair would capitalize the project by reverse-merging Sokol into a

publicly-traded shell corporation.  (*Id*.)

In February of 2003, Savage and Sinclair took the first step in implementing the Sokol

Business Plan by enlisting the aid and participation of defendants Baiseitov, Cherdabayev, and

Kunayev.  (*See id*., at ¶¶ 1, 25, 26.)  These three defendants were Kazakh nationals, and they had

had experience in oil and gas exploration and development, as well as in banking.  (*Id*., at ¶¶ 1,

25.)  Baiseitov, Cherdabayev, and Kunayev agreed to serve as members of Sokol's board of

directors in exchange for an equity interest in the project.  (*Id*., at ¶¶ at 26, 32.)

At roughly the same time, Savage and Sinclair solicited the services of defendants Agaian, Benarroch, CSL, and CCI.  (*Id*., at ¶ 26.)  Savage and Sinclair planned for these defendants to serve as advisors and consultants with regard to finance and capitalization.  (*Id*., at ¶¶ 26, 33.)  Agaian owned a company called ANBI (*id*., at ¶ 25), which is  not a named defendant in this action.  Benarroch was a director and officer of CSL, a Canadian consulting firm.[1]  (*Id*., at ¶ 24, 25.)  CSL was a wholly owned subsidiary of CCI (hereinafter, CSL and CCI are collectively referred to as "Credifinance").  (*Id*., at ¶ 24.)  Savage and Sinclair first approached Agaian and Benarroch in early February, 2003, and discussed with them the feasability of the Sokol business plan and the likelihood of obtaining financing.  (*See id*., at ¶ 26.)  On March 11, 2003, Benarroch apparently confirmed that the Sokol business plan was workable, and he agreed that Credifinance would serve as Sokol's investment banker.  (*See id*., at ¶ 27.)  Agaian also agreed to participate in the project, and he was promised an ownership interest in Sokol.  (*Id*., at ¶ 45.)  Sokol was formally incorporated in Delaware on March 31, 2003.  (*Id*., at ¶ 28.)

In March or April of 2003,[2] Savage and Sinclair provided copies of the Sokol Business Plan to each of the Individual Defendants.  (*Id*., at ¶ 30.)  The particular version that was delivered on that date was dated March 31, 2003, and the first page of each copy contained a "Confidentiality Statement," warning the recipient that the Sokol Business Plan was highly

---

[1] Benarroch was also the president and CEO of a company called IUFN, which the parties, at one point, planned on merging with Sokol for capitalization purposes.  (2d Am. Compl., at ¶ 25.)

[2] The Second Amended Complaint actually alleges that this took place in 2005.  (2d Am. Compl., at ¶ 30.)  This, however, appears to be a typographical error, as this action was first filed in April, 2005.

confidential, that it belonged to Sokol and its subsidiaries, and that Sokol could suffer irreparable

harm if the details of the plan were disclosed to a third party.  (*Id*.)

>    2.    **The Sokol-Emir Contract**

In early 2003, an entity called Emir Oil, LLP ("Emir") owned the ADE Fields (*id*., at

¶¶ 4, 56), and it possessed the legal right to extract gas and oil from the land (*id*., at ¶ 4).  In

March, 2003, ANBI, through Sinclair (who had previously been appointed ANBI's "legal

representative"), began negotiating with Tolmakov Toleush Kalmukanovitch ("Tolmakov"), an

individual who owned a significant portion of Emir, for the purchase of Emir's interest in the

ADE Fields.  (*Id*., at ¶¶ 4, 39.)  On March 17, 2003, ANBI and Emir executed a letter of intent

(the "Letter of Intent"), which contemplated the purchase and sale of 70% of Emir.  (*Id*., at ¶ 39.)

ANBI, rather than Sokol, executed the Letter of Intent because, at that time, Sokol had not yet

been incorporated.  (*Id*.)  Sinclair, however, had been authorized to conduct negotiations with

Emir, and to enter into the agreement discussed above, on ANBI's behalf, on the understanding

that, upon Sokol's incorporation, Sokol would assume all of ANBI's rights and obligations set

forth in the Letter of Intent.  (*Id*.)

Pursuant to the Letter of Intent, ANBI acquired the exclusive right, for one month, "to

undertake financial legal and technical due diligence on Emir and the ADE licenses and assets."

(*Id*., at ¶ 41.)  Further, upon satisfactory due diligence, the Letter of Intent obligated ANBI to

purchase 70% of Emir, at a price of $1.5 million.  (*Id*., at ¶ 43.)  Thereafter, Baiseitov,

Cherdabayev, and Kunayev, together with another individual who is not a party in this action,

agreed to contribute the funds necessary to consummate the transaction.  (*Id*., at ¶ 42.)

On April 26, 2003, after due diligence had apparently been completed, Sokol and Emir entered into a formal contract, pursuant to which Sokol would purchase 70% of Emir for $1.5 million (hereinafter, the "Sokol-Emir Contract").[3]  (*Id*., at ¶¶ 43, 46.)  Under the Sokol-Emir Contract, Sokol was obligated to tender an initial installment of $700,000, on or before April 30, 2003.  (*Id*., at ¶ 48.)  Cherdabayev and Baiseitov agreed to contribute the $700,000 necessary to make this initial payment.  (*Id*.)

### 3.    The Individual Defendants' Alleged Plan To Develop the ADE Fields Themselves and To Exclude Plaintiffs From the Project

Despite the Confidentiality Statement in the Sokol Business Plan, the Individual Defendants allegedly concocted a scheme to use the information in the plan to develop and exploit the ADE fields themselves, but to exclude Savage and Sinclair from the project.  (*See id.*, at ¶ 35.)  Toward this end, in May or early June of 2003, the Individual Defendants formed and incorporated BMB Holdings, Inc. – BMB's predecessor – for the purpose of purchasing Emir's interest in the ADE Fields.  (*Id*.)  To achieve this objective, sometime in May, 2003, the Individual Defendants allegedly caused Tolmakov and Emir to breach the Sokol-Emir Contract.  (*Id*., at ¶¶ 57-59.)  Thereafter, BMB,[4] acting through the Individual Defendants, executed an agreement with Tolmakov for the purchase of 70% of Emir.  (*Id*., at ¶ 59.)  Thus, according to

---

[3] The Second Amended Complaint actually alleges that the purchase price was 57,610 Tenge, which is the currency used in Kazakhstan.  (*Id*., at ¶ 46.)  The Court also notes that the Second Amended Complaint is not consistent as to the interest in Emir that ANBI agreed to purchase.  At one point, Plaintiffs allege that Sokol contracted for the purchase of 70% of Tolmakov's 90% interest in Emir (*id*., at ¶ 4), while, elsewhere in the pleading, Plaintiffs allege that Sokol agreed to purchase 70% of Emir (*id*., at ¶¶ 43, 46).

[4] It is not clear from the Second Amended Complaint when BMB Holdings, Inc., became BMB.

Plaintiffs, BMB entered into a transaction with Emir that was "precisely identical to the transaction that Sokol and Emir [had previously] agreed to." (*Id.*, at ¶¶ 59-60.)

Cherdabayev, Baiseitov, Kunayev, and Agaian each became officers and/or directors of BMB, and Benarroch and Credifinance both received an equity interest therein. (*Id.*, at ¶ 57.) Consequently, Plaintiffs contend, Defendants received the benefit of the Sokol Business Plan, which Savage and Sinclair had conceived, as well as the benefit of the deal with Emir, which Sinclair had negotiated. (*See id.*, at 59-60.) Savage and Sinclair, on the other hand, were excluded from the project altogether. (*Id.*)

### 4.    Plaintiffs' Alleged Theories of Recovery

The Second Amended Complaint asserts nine separate causes of action:  tortious interference with contract (Count I) (*id.*, at ¶¶ 63-67); specific performance (Count II) (*id.*, at ¶¶ 68-73); breach of contract (Count III) (*id.*, at ¶¶ 74-78); unjust enrichment (Count IV) (*id.*, at ¶¶ 79-82); breach of fiduciary duty, by Sokol, against Agaian, Benarroch, and Credifinance (Count V) (*id.*, at ¶¶ 83-86); unfair competition – misappropriation of labors and expenditures (Count VI) (*id.*, at ¶¶ 87-90); breach of fiduciary duty, by Sokol, against Cherdabayev, Kunayev, and Baiseitov (Count VII) (*id.*, at ¶¶ 91-95); tortious interference with fiduciary duty, by Sokol, against Agaian, Benarroch, and Credifinance (Count VIII) (*id.*, at ¶¶ 96-99); and aiding and abetting breach of fiduciary duty, by Sokol, against Agaian, Benarroch, and Credifinance (Count IX) (*id.*, at ¶¶ 100-103).[5]

---

[5] As noted below, the Court (Wood, J.) dismissed Counts VII, VIII, and IX of the Second Amended Complaint on June 15, 2007.  (Dkt. 47.)

**B.**   **Procedural History**

1.   **Plaintiffs' Initial Complaint, Their First Two Amended Pleadings, and This Court's November 3, 2005, Scheduling Order**

Sokol first filed this action on April 12, 2005, and the initial Complaint asserted claims for tortious interference with contract and specific performance. (Dkt. 1.) On September 9, 2005, Defendants moved to dismiss the initial Complaint or, alternatively, to stay it pending arbitration. (Dkt. 9.) Rather than file an opposition to Defendants' motion to dismiss or stay, on October 12, 2005, Plaintiffs filed an Amended Complaint, wherein they added Savage and Sinclair as plaintiffs, named Credifinance as a defendant, and asserted a number of additional claims. (Dkt. 13.) Plaintiffs filed the First Amended Complaint as of right, because, at that time, Defendants had not yet filed an answer to the initial Complaint. *See* Fed. R. Civ. P. 15(a)(1)(A). In November of 2005, in light of Plaintiff's amended pleading, Defendants withdrew their motion to dismiss or stay the initial Complaint. (Dkts. 14, 17.)

On November 3, 2005, this Court issued a Scheduling Order, which provides, in pertinent part, "Except for good cause shown . . . [, n]o additional claims or defenses may be asserted after 90 days from the date Defendants file their answer(s) to the operative complaint." (Dkt. 15.)

On November 15, 2005, Plaintiffs filed the Second Amended Complaint (Dkt. 18), although the Court's Docket does not reflect that they sought leave of Court to do so.

2.   **Defendants' Motion To Dismiss or Stay the Second Amended Complaint**

On November 30, 2005, Defendants moved to dismiss or stay the Second Amended Complaint. (Dkt. 19.) This Court (Wood, J.) denied that motion "without prejudice to renew after the related discovery is completed." (Dkt. 24.) On June 12, 2006, Defendants renewed

their motion to dismiss or stay the Second Amended Complaint (Dkt. 26), and, on June 15, 2007,

that motion was granted in part (Dkt. 47).  Specifically, this Court (Wood, J.) dismissed former

Counts VII, VIII, IX, which sought to recover from the Individual Defendants and Credifinance,

based on Cherdabayev, Kunayev, and Baiseitov's alleged breach of fiduciary duties owed to

Sokol.[6]  The Court dismissed these claims because Plaintiffs did not allege that Cherdabayev,

Kunayev, and Baiseitov were ever officially installed as directors of Sokol and, thus, as a matter

if law, at no point did these defendants owe a fiduciary duty to Sokol.  (Dkt. 47, at 14 (citing

*In re Walt Disney Company Derivative Litigation*, C.A. No. 15452, 2004 Del. Ch. LEXIS 132,

*8 (Del. Ch. Ct. Sept. 10, 2004) (unpublished disposition); *Omnicare, Inc., Omnicare, Inc. v.

NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del. Ch. Ct. 2002).)  In their opposition papers,

Plaintiffs argued that Cherdabayev, Kunayev, and Baiseitov owed fiduciary duties to Sokol

based on their status as "promoters," but the Court rejected this argument because the promoter

allegation did not appear in the Second Amended Complaint.  (Dkt. 47, at 14 n.9.)  The Court

otherwise denied Defendants' motion to dismiss, and it also denied Defendants' motion for a

stay pending arbitration.  (*See* Dkt. 47.)

On July 2, 2007, Defendants appealed this Court's June 15, 2007, Order, insofar as it

denied their request for a stay pending arbitration.  (Dkt. 52.)  On the same date, Defendants

moved for an order to show cause why this matter should not be stayed pending the Second

Circuit's disposition of Defendants' appeal.  (Dkt. 48.)  On July 16, 2007, while Defendants'

---

[6] In Count VIII, Plaintiffs alleged that Agaian, Benarroch, and Credifinance tortiously interfered with Cherdabayev, Kunayev, and Baiseitov's fiduciary duties owed to Sokol (2d Am. Compl., at ¶¶ 96-99), and in Count IX, Plaintiffs alleged that Agaian, Benarroch, and Credifinance aided and abetted in Cherdabayev, Kunayev, and Baiseitov's breach of those duties (*id*., at ¶¶ 100-03).

appeal was pending in the Second Circuit Court of Appeals, Defendants filed an answer to the

Second Amended Complaint.  (Dkt. 56.)  On July 19, 2007, this Court (Wood, J.) denied

Defendants' motion for a stay of all proceedings pending Defendants' appeal.  (Dkt. 57.)

On September 18, 2008, the Second Circuit affirmed this Court's denial of Defendants'

motion to stay this matter pending arbitration as to all claims except Plaintiffs' claim for specific

performance.  *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354 (2d Cir. 2008).  The

Second Circuit held that the specific performance claim was arbitrable because, in essence, it

sought to enforce against Defendants certain contractual terms found in the Sokol-Emir

Contract – a contract to which Defendants were not parties.  *Id*., at 362.  The Second Circuit

reasoned that, if Plaintiffs could show that Defendants were bound by obligations assumed by

Emir in the Sokol-Emir Contract, Defendants should be entitled to rely on other provisions in the

contract, including its arbitration clause.  *Id*.  The Second Circuit thus held that Defendants were

entitled to arbitrate Plaintiffs' specific performance claim, although the court rejected

Defendants' argument that Plaintiffs' remaining claims should be stayed pending arbitration.  *Id*.

### 3.      Plaintiffs' Motion for Leave To File the Third Amended Complaint

On October 14, 2008, in light of the Second Circuit's September 18, 2008, decision, this

Court (Wood, J.) issued an Order directing Plaintiffs, no later that October 24, 2008, either:

(1) to move for leave to re-plead; or (2) to move to stay or dismiss their specific performance

claim.  (Dkt. 68.)  On October 24, 2008, Plaintiffs moved for leave to amend the Second

Amended Complaint.  (Dkt. 70.)  Thereafter, the parties agreed to attend mediation, and they

stipulated that Plaintiffs' motion to amend would be withdrawn without prejudice, pending the

outcome of mediation.  (Dkt. 73.) They further agreed that, if the parties could not reach

settlement, Plaintiffs would be able to re-file their motion to amend.  (*Id*.)  This Court adopted the parties' stipulation on November 7, 2008.  (*Id*.)

Mediation did not result in settlement, and Plaintiffs re-filed their motion to amend on December 12, 2008 (Dkt. 75), together with a declaration in support of the motion (Declaration of Thomas E. L. Dewey in Support of Motion for Leave to Amend, dated Dec. 12, 2008 (Dkt. 77)), to which the Third Amended Complaint was attached as Exhibit A, and a memorandum of law (Plaintiffs' Memorandum of Law in Support of their Motion for Leave to Amend the Complaint, dated Dec. 12, 2008 ("Pl. Mem.") (Dkt. 76)).  Defendants opposed Plaintiffs' motion on January 7, 2009 (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Leave to Amend the Second Amended Complaint, dated Jan. 7, 2009 ("Def. Mem.") (Dkt. 84)); Plaintiffs filed a reply memorandum on January 21, 2009 (Plaintiffs' Reply Memorandum of Law in Support of their Motion for Leave to Amend Their Complaint, dated Jan. 21, 2009 ("Pl. Reply Mem.") (Dkt. 93)); and Defendants filed a sur-reply on January 26, 2009 (Defendants' Sur-Reply Memorandum of Law in Further Opposition to Plaintiffs' Motion for Leave to Amend the Second Amended Complaint, dated Jan. 26, 2009 ("Def. Sur-Reply") (Dkt. 94)).

### 4. Plaintiffs' Proposed Amendments

#### a. Additional Factual Allegations

The proposed Third Amended Complaint seeks to add a handful of factual allegations that are not pleaded in the Second Amended Complaint.  First, it would allege that Baiseitov, Cherdabayev, and Kunayev agreed to contribute a total of $700,000 to purchase, on Sokol's behalf, Emir's interest in the ADE Fields.  (3d Am. Compl., at ¶ 46.)  It also seeks to plead that this contribution was made *in exchange* for Baiseitov, Cherdabayev, and Kunayev's receipt of a

15% ownership interest in Sokol.[7]  (*Id*., at ¶¶ 25, 45.)  Second, the proposed Third Amended Complaint would allege that Defendants induced Tolmakov to breach the Sokol-Emir Contract and to sell 70% of Emir to BMB instead, by paying Tolmakov $200,000 in cash.  (*Id*., at ¶ 60.) It would also allege that Defendants likely made this $200,000 payment on April 26, 2003, the very day that the Sokol-Emir Contract was executed.  (*Id*.)  Finally, Plaintiffs' proposed pleading would allege that Defendants caused Sokol to breach the Sokol-Emir Contract when Cherdabayev, Kunayev, and Baiseitov failed to transfer their $700,000 contribution to Sokol in a timely fashion, thereby causing Sokol to default on its first payment to Emir.  (*Id*., at ¶¶ 61, 68.)

### b.    Changes to Plaintiffs' Theories of Recovery

The proposed Third Amended Complaint would excise Plaintiffs' claim for specific performance (Count II in the Second Amended Complaint) and remove Agaian as a defendant on Sokol's first breach of fiduciary duty claim (Count IV in the Third Amended Complaint).  It would also revise the factual allegations underpinning Count I, which asserts a claim for tortious interference with contract.  (3d Am. Compl., at ¶ 65-70.)  In particular, while Plaintiffs currently allege, only generally, that Defendants "induced Tolmakov to breach the [Sokol-]Emir Contract and to execute a virtually identical agreement with BMB" (2d Am. Compl., at ¶ 66), the proposed Third Amended Complaint, as noted above, would allege more specifically that Defendants caused *Sokol* to breach the Sokol-Emir Contract when Cherdabayev, Kunayev, and

---

[7] The Second Amended Complaint alleges that only Cherdabayev and Baiseitov agreed to contribute the $700,000 (2d Am. Compl., at ¶ 48), and it does not specifically allege that these defendants agreed to make these contributions in exchange for an equity interest in Sokol.  The Second Amended Complaint also alleges that only Cherdabayev and Baiseitov were promised a 15% ownership interest in Sokol, and, although it suggests that Kunayev, too, was promised an equity interest, it does not specify the exact percentage.  (*See id*., at ¶ 45.)

Baiseitov refused to make the $700,000 contribution that they had previously promised, which, in turn, caused Sokol to default on its first payment due under the Sokol-Emir Contract (3d Am. Compl., at ¶¶ 67-68).

The proposed Third Amended Complaint would also modify Plaintiffs' unjust enrichment claim (Count III in the Third Amended Complaint) by specifying the damages to which Plaintiffs are allegedly entitled on this theory.  (*Id.*, at ¶¶ 79-80.)  While the Second Amended Complaint contains only a general allegation that Defendants were unjustly enriched (2d Am. Compl., at ¶ 82), the Third Amended Complaint seeks to allege explicitly that, on this claim, Plaintiffs can "recover from BMB in the amount of 70% of BMB's interest in Emir and its underlying interest in the ADE fields."[8]  (3d Am. Compl., at ¶ 80.)

Counts VI, VII, and VIII of the proposed Third Amended Complaint would recast former Counts VII, VIII, and IX, wherein Plaintiffs alleged, respectively, breach of fiduciary duty, by Sokol, against Cherdabayev, Kunayev, and Baiseitov; tortious interference with fiduciary duty, by Sokol, against Agaian, Benarroch, and Credifinance; and aiding and abetting breach of fiduciary duty, by Sokol, against Agaian, Benarroch, and Credifinance.  (*Compare* 2d Am. Compl., at ¶¶ 91-103 *with* 3d Am. Compl., at ¶¶ 89-101.)

In Count VI of the proposed Third Amended Complaint, Plaintiffs now seek to allege that Sokol, Savage, and Sinclair may recover from the Individual Defendants and Credifinance based on a breach of fiduciary duty.  (3d Am. Compl., at ¶¶ 89-94.)  In the corresponding Count VII of the Second Amended Complaint, only Sokol seeks to recover, as against only Cherdabayev,

---

[8] Plaintiffs also seek to add the allegation that they conferred a benefit upon Defendants when they initially brought all of the parties in this matter together.  (3d Am. Compl., at ¶ 77.)

Kunayev, and Baiseitov.  (2d Am. Compl., at ¶¶ 91-95.)  The Third Amended Complaint would also alter the factual allegations predicating this claim, as Plaintiffs now take the position that each of the Individual Defendants owed Sokol, Sinclair, and Savage a fiduciary duty based on their status as "promoters" of Sokol.  (3d Am. Compl., at ¶ 90.)  In the Second Amended Complaint, on the other hand, Plaintiffs allege only that Cherdabayev, Kunayev, and Baiseitov owed Sokol a fiduciary duty because these defendants were "constructive[] directors" of Sokol.  (2d Am. Compl., at ¶ 92.)  Counts VII and VIII in the Third Amended Complaint are derivative of Count VI, as they depend on an underlying breach of fiduciary duty by defendants Cherdabayev, Kunayev, and Baiseitov.  (*See* 3d Am. Compl., at ¶¶ 95-101.)  The proposed Third Amended Complaint would thus amend these claims to be consistent with the proposed amendment to Count VI.

Finally, the Third Amended Complaint would assert, for the first time, claims for fraud (Count IX) (*Id.*, at ¶¶ 102-07), and promissory estoppel (Count X) (*Id.*, at ¶ 108-11).

## DISCUSSION

## I.    APPLICABLE LEGAL STANDARDS

Rule 15(a) of the Federal Rules of Civil Procedure provides that the Court "should freely give leave [to amend] when justice so requires."  A motion to amend a pleading under Rule 15(a) should be denied, however, "if there is an 'apparent or declared reason – such as undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.'"  *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *accord*

*Richardson Greenshields Secs., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (citation

omitted).  The Court has broad discretion to determine whether to grant a motion to amend based

on the relevant factors.  *See Local 802, Associated Musicians of Greater New York v. Parker*

*Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998).

In this case, however, Rule 15(a) does not provide the sole standard for the Court's

analysis of Plaintiffs' motion to amend, given that the motion was filed more than a year after

the motion deadline set by the Court.[9]  Under the circumstances, Rule 16(b) of the Federal Rules

of Civil Procedure is also implicated.

Rule 16(b) requires the Court to enter a scheduling order that sets a deadline for motions

to amend the pleadings, *see* Fed. R. Civ. P. 16(b)(1), (3)(A), and then dictates that the schedule

"may be modified only for good cause," Fed. R. Civ. P. 16(b)(4).  The purpose of Rule 16(b) is

"to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the

parties and the pleadings will be fixed."  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326,

339-40 (2d Cir. 2000) (internal citations and quotation marks omitted).  Thus, where a

scheduling order has issued that fixes a deadline for asserting additional claims, a party seeking

leave to amend its pleading after the expiration of the deadline must show "good cause" to

modify the scheduling order.  *See id.*, at 339-41 ("despite the lenient standard of Rule 15(a), a

district court does not abuse its discretion in denying leave to amend the pleadings after the

---

[9] Pursuant to the Court's November 3, 2005, Scheduling Order (Dkt. 15), Plaintiffs were given 90 days after Defendants answered the Second Amended Complaint to assert any additional claims.  Defendants answered the Second Amended Complaint on July 16, 2007 (Dkt. 56), and Plaintiffs' deadline for alleging additional claims thus expired on October 15, 2007.  It was not until more than a year later – on October 24, 2008 – that Plaintiffs moved for leave to file the Third Amended Complaint.  (Dkt. 70.)

deadline set in the scheduling order where the moving party has failed to establish good cause"); *see also New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.*, 07 Civ. 8304 (JFK), 2009 U.S. Dist. LEXIS 45857, at *6-9 (S.D.N.Y. Jun. 1, 2009).  Good cause in this context "depends on the diligence of the moving party," *Parker*, 204 F.3d at 340, and, to satisfy the standard, the movant must demonstrate that it has been diligent in its efforts to meet the Court's deadlines, *see Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003).  In other words, the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met.  *Rent-A-Center Inc. v. 47 Mamaroneck Ave. Corp.*, 215 F.R.D. 100, 104 (S.D.N.Y. 2003); *see also Parker*, 204 F.3d at 340.

Examples of a party's failure to act with sufficient diligence include basing a proposed amendment on information that the party knew, or should have known, in advance of the deadline.  *Id.*, at 340 (citing *In re Milk Products Antitrust Litigation*, 195 F.3d 430, 437 (8th Cir. 1999); *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998); *Johnson v. Mammoth Recreations*, 975 F.2d 604, 609 (9th Cir. 1992)); *cf. Estate of Ratcliffe v. Pradera Realty Co.*, No. 05 Civ. 10272 (JFK), 2007 U.S. Dist. LEXIS 78070, at *11 (S.D.N.Y. Oct. 19, 2007) (finding good cause standard satisfied where the moving party based its proposed amendment on evidence discovered subsequent to the expiration of the discovery deadline).

Thus, to be entitled to amend their pleading, Plaintiffs must first show good cause for their failure to meet the amendment deadline set in the Court's Scheduling Order.  Only if they are able to do so, would the Court need to consider whether the proposed amendment would be futile, unduly prejudicial, or otherwise improper based on the Rule 15(a) standards that

otherwise govern motions to amend.  *See Parker v. Columbia Pictures Industries*, 204 F.3d 326,

340 (2d Cir. 2000); *Estate of Ratcliffe*, 2007 U.S. Dist. LEXIS 78070, at *11.

## II.     PLAINTIFFS' MOTION TO AMEND

### A.     Portions of the Motion To Which Defendants Do Not Object

The Court notes that, with respect to the substance of Plaintiffs' proposed claims,

Defendants' opposition papers focus exclusively on Plaintiffs' effort to assert Counts VI through

X of the proposed Third Amended Complaint.  (*See generally* Def. Mem.; Def Sur-Reply; *see*

*also* Letter to Court, from Defendants, dated Feb. 19, 2009 (noting that, were Plaintiffs' motion

granted, Defendants would only need discovery with respect to Counts VI through X of the

Third Amended Complaint).)  Defendants thus appear to have no specific objection to Plaintiffs'

excising their specific performance claim and revising their claims for tortious interference with

contract (Count I of the proposed Third Amended Complaint) and unjust enrichment (Count III

of the Third Amended Complaint), as well as their first breach of fiduciary duty claim (Count IV

of the Third Amended Complaint).

Under the circumstances, Plaintiffs' motion for leave to file the Second Amended

Complaint is granted, to the extent Plaintiffs seek to withdraw Plaintiffs' specific performance

claim, and to assert Counts I, III, and IV of the Third Amended Complaint.  Further, Plaintiffs'

motion is granted to the extent it seeks to allege the modified factual allegations found in

paragraphs 46, 60, and 61 of the Third Amended Complaint, as they relate to proposed Count I.

### B.     Counts VI-X of the Proposed Third Amended Complaint

To the extent Defendants do oppose Plaintiffs' motion to amend, they focus on Counts VI

through X, which are different, in significant ways, from the claims previously pleaded.

Counts VI, VII, and VIII differ from their counterparts in the Second Amended Complaint (former Counts VII, VIII, and IX) in two ways:  First, with regard to Count VI (Breach of Fiduciary Duty), the proposed Third Amended Complaint purports to add Agaian, Benarroch, and Credifinance as defendants, in addition to those previously named on this claim (Cherdabayev, Kunayev, and Baiseitov).  (*Compare* 2d Am. Compl., at ¶¶ 91-95 *with* 3d Am. Compl., at ¶¶ 89-94.)  Second, rather than assert that Cherdabayev, Kunayev, and Baiseitov owed fiduciary duties to Plaintiffs because they were constructive directors of Sokol, as in the Second Amended Complaint (2d Am. Compl., at ¶ 92), Plaintiffs now seek to allege that these defendants, as well as Agaian, Benarroch, and Credifinance, owed Plaintiffs fiduciary duties by virtue of their status as "promoters" of Sokol (3d Am. Compl., at ¶¶ 90-91).[10]  As noted above, Counts VII and VIII are derivative of Count VI, and, therefore, the Third Amended Complaint recasts these claims by again alleging that Cherdabayev, Kunayev, and Baiseitov were "promoters" of Sokol, and that these defendants owed fiduciary duties to all Plaintiffs on that basis.  (*Id*., at ¶¶ 95-101.)  As for Counts IX and X, these counts, as noted above, assert new claims (for Fraud and Promissory Estoppel), never previously pleaded.

Defendants object to Plaintiffs' proposal to modify or add these claims on the principal ground that Plaintiffs waited too long to do so, and that Plaintiffs cannot show "good cause" under Rule 16(b) for having failed to assert their new theories of recovery prior to the expiration of the Court's deadline for amendments.  (Def. Mem., at 9-14; Def. Sur-Reply, at 1-5.)[11]

---

[10] Proposed Counts VI, VII, and VIII also differ insofar as Plaintiffs now allege that Savage and Sinclair may recover on this ground.  (3d Am. Compl., at ¶¶ 89-101.)

[11] Defendants also argue, *inter alia,* that they would suffer prejudice if Plaintiffs were permitted to amend their pleading a third time, at this late date, as the amendment would

Plaintiffs, for their part, counter by arguing that they exercised appropriate diligence in moving for leave to amend, given that, at the time this Court's deadline for amendment expired, the Court's ruling on Defendants' prior dismissal motion was pending before the Second Circuit, divesting this Court of jurisdiction to consider whether a further amendment would be proper. (Pl. Reply Mem., at 1-4.)  Thus, Plaintiffs suggest, they would have been *unable* to file their motion to amend on a timely basis.  (*Id*.)

Overall, Defendants have the better of these arguments.  As an initial matter, the Court notes that what is at issue here is not Plaintiffs' initial pleading, nor their first amended pleading, nor even their second amendment.  Rather, this is Plaintiffs' attempt at a *fourth* "bite at the apple," to articulate viable legal theories based on facts that were known to them before this action was ever commenced, in 2005.

Certainly, well before there was an appeal to the Second Circuit, Plaintiffs were aware of the facts supporting their proposed new Counts VI through VIII.  Indeed, the factual allegations predicating Plaintiffs' new "promoter" theory of liability do not differ in any respect from facts already alleged in the Second Amended Complaint.[12]  Moreover, all of the facts that could support this theory relate to the relationship between Sokol and the Individual Defendants and Credifinance; a relationship that was established in 2003 and ended several weeks later, when these defendants essentially abandoned Plaintiffs, giving rise to Plaintiffs' claims.  In addition,

---

necessitate the reopening of otherwise closed discovery.  (Def. Mem., at 18-20.)  They also argue that Plaintiffs' proposed amendments would be futile, as, in Defendant's view, they would not survive a motion to dismiss.  (*Id*., at 21-24.)

[12] In their Reply Memorandum, Plaintiffs list the myriad facts on which they base this allegation (*see* Pl. Reply Mem., at 7-8.), all of which are alleged in the Second Amended Complaint.

Plaintiffs were plainly aware of a potential defect in their existing fiduciary duty claims before the Second Circuit ever assumed jurisdiction over the appeal.  In arguing, in opposition to the motion to dismiss the Second Amended Complaint, that certain of the named defendants should be considered "promoters" (*See* Dkt. 47, at 14 n.9), Plaintiffs showed that they knew, at that time, not only the factual underpinnings of their newly-proposed fiduciary duty claims, but also that their claims could have been cast in terms of "promoter" liability.

Similarly, Plaintiffs had access to all the facts necessary to plead fraud and promissory estoppel claims (proposed Counts IX and X), well before the Second Circuit appeal, and, in fact, for years before they finally decided to try to assert such claims.  As both of these claims would seek to recover for alleged representations made by Defendants, directly to Plaintiffs, it would follow that the representations themselves were known to Plaintiffs when they were purportedly made, in 2003.  As to the fraud claim, Plaintiffs would have been on notice of the potential fraudulent nature of Defendants' representations when they first discovered Defendants' alleged scheme to usurp the Sokol business plan, an allegation that is at the heart of this action.  (*See* 2d Am. Compl., at ¶¶ 3, 35.)  The only other allegations that would be relevant to Plaintiffs' proposed promissory estoppel claim would relate to the ways in which Plaintiffs detrimentally relied on those representations – facts of which Plaintiffs would also have been aware prior to filing this action.

In sum, Plaintiffs would be hard pressed to argue that any of the facts on which they now rely are new, or that any of the legal claims that they now wish to assert could not have been raised earlier, even years ago.  This counsels against a finding of "good cause" under Rule 16(b) for a late motion to amend.  *See Parker*, 204 F.3d at 341 (affirming trial court's denial of

Plaintiff's motion for leave to amend under Rule 16(b) because, when plaintiff commenced

action, he "had all the information necessary to support [his proposed additional claim], and

nothing he learned in discovery or otherwise altered that fact.") (citing *Sosa*, 133 F.3d at 1419

(finding a lack of "good cause" where "the information supporting the proposed amendment to

the complaint was available to [the moving party] even before she filed suit")); *cf. New Yuen Fat

Garments Factory Ltd.*, 2009 U.S. Dist. LEXIS 45857 (finding good cause where proposed

cause of action was based on evidence that was unavailable to plaintiff prior to discovery).

Further, while this Court may have lacked jurisdiction to decide Plaintiffs' motion to

amend during the pendency of the appeal, *see Griggs v. Provident Consumer Discount Co.*, 459

U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance – it

confers jurisdiction on the court of appeals and divests the district court of its control over those

aspects of the case involved in the appeal."),[13] nothing about the pendency of the appeal would

have prevented Plaintiffs from requesting that this Court extend its case management deadlines.

This is especially true given that Defendants had sought unsuccessfully (and over Plaintiffs'

objection) to stay all proceedings in this Court pending the outcome of the appeal.  (*See* Dkts. 51,

54, 57.)  By denying Defendants' motion for a stay (Dkt. 57), this Court placed Plaintiffs on

notice that it intended to continue to oversee all aspects of the case that were not directly

---

[13] *See also Hom Sui Ching v. United States*, 298 F.3d 174, 180 n.5 (2d Cir. 2002) (noting
that a district court cannot rule on "any motion affecting an aspect of the case that was before
[the appellate court], including a motion to amend . . . , while that appeal was pending") (citing
*Hernandez v. Coughlin*, 18 F.3d 133, 138 (2d Cir. 1994)); *Dayton Independent School District v.
U.S. Mineral Products Co.*, 906 F.2d 1059 (5th Cir. 1990) (holding that district Court lacked
jurisdiction to grant motion to amend seeking to excise certain claims, where sufficiency of those
claims was pending before the Fifth Circuit because motion to amend sought to "alter[] the status
of the case as it rest[ed] before the Court of Appeals").

involved in the appeal.  Under these circumstances, and as Plaintiffs easily could have sought to extend the motion deadline for amendments, but failed to do so, the pendency of the appeal does not, in itself, constitute "good cause" for Plaintiff's failure to comply with this Court's scheduling order.  *See Laflamme v. Carpenters Local #370 Pension Plan*, 220 F.R.D. 181 (N.D.N.Y. 2003) (finding that plaintiffs had not established "good cause" for failing to amend by a court-ordered deadline by arguing that they could not have timely moved due to defendants's failures in discovery, where plaintiffs could have sought to extend the deadline prior to its expiration).

Finally, the mere fact that both the Second Circuit and this Court noted that Plaintiffs could move for leave to file another amended pleading, *see Sokol Holdings, Inc.*, 542 F.3d at 362; *see also* Dkt. 68, does not mean that either court has already determined that a further amendment should be allowed.  No ruling of either court relieved Plaintiffs of the burden of showing good cause, pursuant to Rule 16(b), for having failed to comply with this Court's Scheduling Order.  *See Trezza v. NRG Energy, Inc.*, No. 06 Civ. 11509 (PKC) (DF), 2008 U.S. Dist. LEXIS 15478, at *18 (S.D.N.Y. Feb. 28, 2008).

Considering (1) the nature of the proposed amendments, which do not involve any newly-discovered evidence; (2) the fact that Plaintiffs could have asserted their new claims at the outset of this case, not to mention at several earlier points along the way during this litigation, including prior to the Second Circuit appeal; (3) the fact that Plaintiffs allowed Defendants to engage in substantial discovery and voluminous legal briefing on Plaintiffs' earlier-asserted claims, before raising their new legal theories; and (4) the fact that Plaintiffs did not even request that the Court extend its scheduling deadlines, but rather waited for more than a year after the

deadline for amendment had expired to seek leave to amend; Plaintiffs have not shown

reasonable diligence in pursuing their amendment, nor "good cause" to modify this Court's prior

Scheduling Order.

Accordingly, the Court need not reach the factors relevant to an analysis under

Rule 15(a). To the extent Plaintiffs seek leave to amend the Second Amended Complaint so as

to plead proposed Counts VI though X, the motion to amend is denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion for leave to file the Third Amended

Complaint (Dkt. 75) is granted insofar as Plaintiffs seek (1) to excise their specific performance

claim; and (2) to assert revised Counts I, III, and IV, and paragraphs 46, 60, and 61 of the

proposed Third Amended Complaint. Plaintiffs motion for leave to file the Third Amended

Complaint is otherwise denied.

Dated: New York, New York
August 14, 2009

SO ORDERED

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Kimba M. Wood, U.S.D.J.

All Counsel (via ECF)

22