UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
ECF CASE

---

SOKOL HOLDINGS, INC., BRIAN SAVAGE }
and THOMAS SINCLAIR }
 }
 }
            Plaintiffs, }
       v. } Case No. 05-cv-3749 (KMW)
BMB MUNAI, INC., ALEXANDRE AGAIAN, }
BAKHYTBEK BAISEITOV, GEORGES }
BENARROCH, BORIS CHERDABAYEV, }
MIRGALI KUNAYEV, CREDIFINANCE }
CAPITAL, INC. and CREDIFINANCE }
SECURITIES, LTD. }
 }
            Defendants. }

---

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN RESPONSE TO THE ORDER OF SEPTEMBER 23, 2010, AND IN SUPPORT OF PLAINTIFFS' MOTION TO RECONSIDER THE ORDER DISMISSING CLAIMS FOR TORTIOUS INTERFERENCE AND UNJUST ENRICHMENT**

Plaintiffs, by and through their undersigned attorneys, hereby supplement Plaintiffs' Motion for Reconsideration of the September 23, 2010 Order, Dismissing Damages Based on Value of BMB Munai, Inc., and move this Court for reconsideration of its Order Dismissing Plaintiffs' Tortious Interference with Contract Claim and Unjust Enrichment Claim.

## INTRODUCTION

As directed by this Court, Plaintiffs submit this Memorandum to explain the evidence they intend to put before the jury on all of the claims sustained in this Court's opinion on summary judgment.

1

The evidence shows that the crucial elements of Plaintiffs case are based on contemporaneous documentary, and testimonial, evidence from *both* Plaintiffs *and* Defendants. This evidence includes proof that

- Defendants, as well as Plaintiffs, acknowledged that Plaintiffs were to be shareholders in the entity that was to control the exploration and development rights to the A, D, and E fields

- the 20% figure is supported not merely by Plaintiffs' say-so and testimony now, but also by contemporaneous documents generated by both Plaintiffs and Defendants, seen by all parties at the time – and so far as the contemporaneous documentary record is concerned, *never* objected to or questioned by any party. Indeed, so far as the contemporaneous written record is concerned, these documents are therefore uncontradicted. Thus an oral say-so is the only thing supporting *Defendants'* factual theory; Plaintiffs' case suffers from no such vulnerability.

- Compensation in this form, and at this level, is also supported by evidence that Plaintiffs have participated in other successful deals, in which they performed the same role, and in which their reward for so doing was receipt of an interest in the new company. It is also supported by reference to the ownership interest received by BMB in this transaction.

- The evidence Plaintiffs submit herewith also shows clearly that the lack of a signed writing agreeing to an allocation of stock is entirely consistent with Defendants' admitted course of dealing, pursuant to which Defendants routinely exchanged hundreds of thousands of dollars, and ownership interest in companies (including publicly held companies), on the basis of purely oral agreements. Indeed, the evidence shows that when asked in deposition in this case why they had no writing for this loan or that purchase, Defendants proudly explained in deposition that is how they do business.

- This evidence also shows that of the three ostensible "principals" in BMB – Boris Cherdabayev, Bakhitbek Baiseitov, and Mirgali Kunayev, *only one* actually put up his own money for this transaction. The interests of the other two were funded by people other than themselves and without any writing to substantiate the transaction. It is thus no wonder at all that Plaintiffs, who had been negotiating with these people for months and with whose clear knowledge and approval the Sokol/Emir contract had been negotiated and signed, understood that the same rules applied to them.

The evidence we submit here also shows a steady flow of emails from Sinclair asking for release of the $700,000 that all parties knew had been wired to New York so it would be ready to make the payment called for by the Sokol/Emir agreement, and it makes plain Sinclair's

2

contemporaneous understanding -- not just his testimony in deposition or at trial in this case -- that the money was to be used for this purpose consistent with the Sokol business plan.  And it shows something else:  that Defendants never once contradicted or even questioned Sinclair's understanding.  Once again, it is Defendants, not Plaintiffs, who are relying purely on *post hoc* oral testimony to support their story.  It is thus Defendants, not Plaintiffs, who have no contemporaneous documentary evidence to support their version of events.

Finally, the evidence -- in the form of declarations from Plaintiffs Savage and Sinclair -- shows that they and their corporate vehicle Sokol could indeed have made the $700,000 payment called for by the contract.[1]  They did not do so because that was not the deal and because -- even weeks after the payment deadline -- Defendants continued, in writings submitted herewith, to induce Plaintiffs to believe that their interest was secure.

Given that Plaintiffs' contemporaneous evidence is so strong, and inlight of the Court's assurance that it retains an open mind on these issues, Plaintiffs submit this evidence as well in support of a motion for reconsideration of the Court's recent decisions regarding tortious interference and unjust enrichment.  The bases for this motion are simple.

*First,* there is simply no way to view the above evidence in a light that does not at least create a question for the jury on the merits of both of those claims.  The documentary and the testimonial record provides eminent basis for a jury to reasonably conclude that Plaintiffs were to receive 20% of the resulting new entity.  It shows that Tolmakov anticipatorily repudiated the Sokol/Emir agreement by entering into a subsequent contract that bound him to sell to someone other than Sokol ***and not to Sokol at all*** except in the imaginary circumstance that Sokol was owned exclusively by B, M and B.  And it shows that Plaintiffs were entirely able to perform the

---

[1] These declarations were not responsive to the Order to Show Cause because that directive did not request evidence on this point.  Rather, that Order required only briefing and evidence on the questions of anticipatory repudiation and on the applicability of the statute of frauds.

3

Sokol/Emir agreement, and that they did not do so because Defendants had consistently induced Plaintiffs to believe that Defendants were putting up the $700,000. The fact that this commitment was not in writing was entirely consistent with Defendants' other dealings.

*Second* the reading of the law on which dismissal of those counts was based is clearly incorrect. Anticipatory repudiation clearly IS established by the Kunayev/Tolmakov agreement. The *Merrill Lynch* case, on which Defendants rely, says as much. That case found no such repudiation because the later agreement carved out the former and so permitted performance of both. (The fact that the case was a declaratory judgment action and not a claim for tortious interference is completely irrelevant: Defendants here invoked the case, after all, not Plaintiffs, and Defendants did so simply to define anticipatory repudiation. The definition it provides is directly applicable. It clearly and cleanly supports only Plaintiffs' theory.)

The statute of frauds invoked in the *Snyder* case is irrelevant for the simple reason that there is absolutely no factual basis for applying the rule stated in that case. The rule governs an agreement for services. There is simply no evidence supporting the contention that there is such an agreement. Plaintiffs don't contend there is one; and Defendants have no evidence showing that there is one. Therefore the rule does not apply. *Snyder* does ***not*** say that any time a person engages in activity in connection with a business activity, that a contract for services should be implied and then the statute of frauds provision governing proof of damages relating to such contracts invoked.

The *Snyder* case is also irrelevant because the law is clear that even if there were a statute of frauds problem with admission of some evidence with respect to a dispute over a service agreement, such evidence is still admissible in support of a claim for unfair competition. *See 777388 Ontario Limited v. Lencore Acoustics Corp.*, 105 F. Supp.2d 56, 62 (E.D.N.Y. 2000), in

4

which Judge Glasser relies on New York Court of Appeals authority to hold: "it is quite clear under New York law that the Statute of Frauds constitutes no bar to a claim of unfair competition, for reason deriving from the principle that tort liability may arise separately from liability under contract." Here Plaintiffs have extensive evidence that they were to be principals in the transaction – a transaction on which they had been working, for years, without any involvement by any Defendant except Bennaroch and his bank.  The evidence shows that Plaintiffs brought the deal to the Defendants, not that Plaintiffs performed "services" for the Defendants.[2]  As one of the judges on the Second Circuit panel remarked during oral argument in the appeal of this Court's denial of the Motion to Compel arbitration, Defendants simply "stole the deal."

      That is Plaintiffs' case, and the evidence supporting it is extensive, written, contemporaneous, and it comes out of the mouths and files of both Plaintiffs and Defendants.  It supports all three of the claims that survived summary judgment – which is why they survived summary judgment. The Motion for Reconsideration of the Court's dismissal of the Tortious Interference and Unjust Enrichment counts, and of the Court's decision precluding proof of Plaintiffs' right to receive 20% of the company that Plaintiffs did so much to bring into existence, should be granted.

---

[2] Indeed, the foundationless character of this claim is revealed cleanly as soon as one asks: what services were to be performed pursuant to this imaginary service agreement?  There is absolutely nothing in the record in this case defining any such services.  And there is also absolutely nothing in this record providing evidence about what compensation should be paid for such services.  Therefore, once again, it is Defendants, and not Plaintiffs, who are left supporting their version of events with nothing but *post-hoc* oral testimony.

### I.     Sinclair Testifies that Defendants agreed to Compensate Plaintiffs With 20% Equity

Tom Sinclair testified that as of April 24, 2003, it was agreed with Defendants that Plaintiffs were to receive 20% of the entity that would purchase the interest in the ADE fields, and that Sinclair would be CFO.  *See* Ex. 6, at 368-369.

### II.    BMB's Agent Agaian and BMB's Banker Credifinance Confirms that Plaintiffs Were Still Part of the Original Deal, Even After April 2003

Exhibit 1 is a Credifinance handwritten note from a May 23, 2003 meeting with Sinclair, Savage, Benarroch and Agaian, which states that "Sokol is a shareholder in BMB."  Georges Benarroch from Credifinance testified that this handwritten note which states "Sokol is shareholder of BMB," confirmed that as of May 23, 2003, Benarroch believed and was told that Sokol was to be a shareholder of BMB.  *See* Ex. 14, at 192-194 (this exhibit "shows that you were told as of May 23rd that Sokol was a shareholder of BMB, and that's how you understood the way this transaction had shaped up, correct"  Answer:  "It's obvious.  Yes.")_.  Exhibit 17 includes other Credifinance handwritten notes that indicate that Sokol was still involved in the deal in May 2003.

Exhibit 2 is an email dated June 17, 2003, from Georges Benarroch to Tom Sinclair, which states: "Just to let you know that things are moving along with your partners.  I hope we can get a (good) deal for all of us."  Mr. Benarroch testified that this email pertains to the ADE field and confirms that as of June 17th, it was his understanding that the other investors in the entity were partners with Mr. Sinclair.  *See* Ex. 14, at 195-196 ("as of June 17th, it was your understanding  that the other investors in this entity were partners with Mr. Sinclair; is that accurate?"  Answer:  "Yes.").

6

Georges Benarroch also testified that on May 6, 2003, it was his understanding that the license was to be purchased by Sokol. *See* Ex. 14, at 72-74. BMB's agent Alexandre Agaian also testified that Benarroch had the understanding that, just as the Sokol Business Plan stated, Sinclair would be CFO of the new company after Benarroch, Agaian and Sinclair met in Toronto. *See* Ex. 3, at 282-285. Agaian testified that the creation of BMB was not designed to cut out Tom and Brian, and was consistent with their having participation in BMB. *See* Ex. 3, at 234-236. *See also* Ex. 23, at 186, where Defendant Baiseitov testifies (in Russian) that Cherdabayev and Kunayev told him that Sinclair wanted to be an employee, and defendants' interpreter interrupts to correct the translation to "shareholder" rather than "employee." Furthermore, Baiseitov's testimony also indicates that even he may not have put his own money into the Emir deal, and that business is done in Kazakhstan very haphazardly. *See* Ex. 23, at 221-245. Cherdabayev testified that decision to become a partner with the other two principals here was not translated into a written agreement. He also testified that this may have occurred at the same time that he began speaking with Sinclair about what ultimately became BMB. Any writings about such a partnership would be in Almaty if they exist but he could not say who controlled any such legal entity if one did exist. Shares were held for B, M and B by entities whose names he did not recall, and he could not recall whether he paid for his shares or whether one of the other two principals paid the money for him. *See* Exhibit 4, Cherdabayev Deposition at pp. 234-243.

Exhibit 5 is a proposed capital structure which Defendant Agaian and sent on May 29, 2003, by Agaian to Mr. Sinclair with the notation, "What is your opinion on the proposed capital structure attached?" The enclosed capital structure shows that Sokol and its Seed Investors would hold 89.7% of the equity in the new company. Agaian testified that this capital structure

7

that he sent to Sinclair on May 29th, which was prepared by Credifinance, indicates Sokol and Seed Investors were to get 89% equity.  *See* Ex. 3, at 354-357.

### III.     Plaintiffs Provided the PGS Report, Which Was Vital to the BMB/Emir Deal

The only geological report which Credifinance and BMB had to use to raise capital throughout the summer of 2003, was the PGS Report which Credifinance obtained from Tom Sinclair on the strict condition that it would only be used to do a deal with Sokol.  Exhibits 9 and 10 show that PGS sent the analysis of the ADE fields to Credifinance only at the direction of Tom Sinclair and only in order that a deal could be done on the ADE fields with Sokol.  Page 6 of exhibit 9, which is a confidentiality agreement between PGS and Credifinance, states: "Credifinance is authorized by Tom Sinclair of Sokol Holdings Inc. to review the ADE Fields data for the purposes of due diligence toward a possible financial transaction."  This handwritten note is signed by Bill Magee of Credifinance and dated May 12, 2003.  Exhibit 10, which is the same confidentiality agreement, shows that the "Receiving Party" of the PGS Report was Credifinance, "on behalf of Sokol."  The fax cover page included in exhibit 10 is from PGS and is dated May 12, 2003, and states:  "We understand Credifinance Securities Limited act on behalf of SOKOL and have therefore inserted this addition on Page 1 in the Confidentiality Agreement."  Exhibit 11 is an email from Credifinance to PGS, dated May 9, 2003, which states that Credifinance will add words to their confidentiality agreement with PGS, to the effect that they are "authorized by Tom Sinclair of Sokol to review ADE data for purpose of due diligence toward a possible financial transaction."  While Credifinance was to only use the PGS report to facilitate at deal with Sokol on the ADE fields, this report instead was used by Defendants Credifinance and BMB to do the same deal without Sokol.  Indeed, it was vital to this process.

Exhibit 12, which is an email from Defendant Alex Agaian to Credfinance dated August 26, 2003, which shows that the reserve data included in the BMB business plan came from the PGS report Credifinance "received from Tom Sinclair this Spring," and that "we don't have any other reserves evaluation than PGS'."

### IV. Plaintiffs' Other Work Product Was Vital to BMB's Deal and Was of Great Value

Exhibit 8 is an email from Tom Sinclair to Credifinance dated April 5, 2003, which demonstrates the due diligence Tom Sinclair was conducting, including reviewing the PGS report and contacting technical consultants, and developing financial models.  Tom also includes an analysis of other oil and gas licenses.  In exhibit 13, Agaian tells Sinclair on May 24, 2003, that the "other docs and presentation files were very impressive and we will use them many times in a [sic] future."  Exhibit 18 demonstrates that Sinclair introduced Credifinance to BMB on May 15, 2003, and in exhibit 19, Defendant Agaian tells Sinclair on May 15 that the information he had sent to BMB was "very useful" and provided "a real example for our team members on how and where to go."  Georges Benarroch testified that there is always value to a public shell and Benarroch did not know of other shells available at the time.  *See* Ex. 14, at 43-45.

### V. Credifinance, Which Did Not Put the Deal Together or Produce as Much Work Product as Plaintiffs, Were Compensated with 25% of Equity in BMB

Exhibit 16, which is a memo from Benarroch from June 12, 2003, shows that Credifinance was compensated with more than 2,000,000 shares in BMB.  In Exhibit 15, Agaian complains on

9

to Sinclair on May 29, 2003, that Credifinance is taking too many shares as compensation – over 5,000,000 shares of BMB.  Sinclair also testified that Credifinance took 25% for their services which was too high and which is how Plaintiffs were cheated.  *See* Ex. 6, at 345-348.

## VI. Evidence that Plaintiffs Have Been Compensated With About 20% Equity Shares as Founders in Other Similar Deals

In the Declarations of Brian Savage (Ex. 20) and Thomas Sinclair (Ex. 21), and the attachments thereto (Ex. 20A, 20B and 20C), Plaintiffs demonstrate that they were compensated with equity shares of 15%, 20%, and 33% for performing similar services as founders, in similar deals.  *See also* Ex. 6, at 26-29.  Finally, in exhibit 22, the Declaration of Brian Savage Regarding Availability of Funds, Mr. Savage declares that he and Thomas Sinclair could have obtained and paid Emir $700,000 by themselves, as of April 26, 2003, but that they did not do so because the Defendants had already collected these funds and were holding them in ANBI's bank account to be wired to Emir, as called for under the Sokol/Emir agreement.

Finally, it is worth pointing to evidence which does not exist.  First, there is no evidence that the parties ever formed an agreement for the provision of services.  Defense counsel's vague description of work done preparing a few financial statements and travelling to Toronto for a meeting, offered in court yesterday without reference to any document embodying such an agreement, is not just totally divorced from what Sinclair and Savage actually did to bring this deal about:  it is also the first description ever offered in this case of the "services" provided pursuant to a "service agreement."  The fact that there is no such agreement – not even any deposition testimony  regarding such an agreement – makes it impossible for defendants to

10

invoke a statute of frauds provision governing evidence of compensation under such agreements. Without a statute of frauds bar, all of plaintiffs' evidence comes in. With all of the evidence in, there can be no question of plaintiffs' right to reach a fact finder.

There is also no evidence in this record that defendants ever disabused plaintiffs of what – it is clear – defendants knew to be plaintiffs' understanding of this transaction. On the contrary, the evidence shows that defendants continued well after April 26 to lull plaintiffs into continued participation in the deal in the belief that they were being treated just like all of the other principals both in terms of receipt of an interest and in terms of the level of formality of documentation required.

New York, New York

September 28, 2010

                                                          DEWEY PEGNO & KRAMARSKY LLP

                                                          _____
                                                          Thomas E. L. Dewey (TD-6243)
                                                          220 East 42nd Street
                                                          New York, New York 10017
                                                          (212) 943-9000

                                                          MARCUS & AUERBACH LLC
                                                          Jerome M. Marcus
                                                          Jonathan Auerbach
                                                          101 Greenwood Ave., Ste. 310
                                                          Jenkintown, PA 19046
                                                          (215) 885-2250

                                                          FARUQI & FARUQI LLP
                                                          Jacob A. Goldberg
                                                          101 Greenwood Ave., Ste. 600
                                                          Jenkintown, PA 19046
                                                          (215) 277-5770
                                                          *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE – CASE NO.: 05-cv-03749**

   I HEREBY CERTIFY that a true and correct copy of the foregoing **PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN RESPONSE TO THE ORDER OF SEPTEMBER 27, 2010**, as well as the accompanying exhibits, and the related **NOTICE OF MOTION** were served via transmission of notices of electronic filing generated by CM/ECF on this 28th day of September, 2010 on:

| | |
|---|---|
| Robert A. O'Hare , Jr., Esq. | Chad R. Derum, Esq. |
| Andrew Charles Levitt, Esq. | James Eusun Ji, Esq. |
| Richard Anthony Menchini, Esq. | L. R. Curtis , Jr., Esq. |
| O'Hare Parnagian LLP | Manning Curtis Bradshaw & Bednar LLC |
| 82 Wall Street, Suite 300 | Newhouse Building |
| New York, NY 10005 | 10 Exchange Place, Third Floor |
| Phone: (212) 425-1401 | Salt Lake City, UT 84111 |
| Fax: (212) 425-1421 | Phone: (801) 363-5678 |
| Email: rohare@ohareparnagian.com | Fax: (801) 364-5678 |
| Email: alevitt@ohareparnagian.com | Email: cderum@mc2b.com |
| Email: rmenchini@ohareparnagian.com | Email: jji@mc2b.com |
| | Email: lcurtis@mc2b.com |

Brent V. Manning, Esq.
Manning Curtis Bradshaw & Bednar LLC
170 South Main Street, Suite 900
Salt Lake City, UT 84101
Phone: (801) 363-5678
Fax: (801) 364-5678
Email: bmanning@mc2b.com

              /s/ Thomas E. L. Dewey
                Thomas E. L. Dewey